BURNES, J.
MEMORANDUM OF DECiSION AND ORDER ON:
I. PLAINTIFFS’ MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS:
II. DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS;
III. PLAINTIFFS’ MOTION FOR PARTIAL SUMMARY AGAINST THIRD-PARTY DEFENDANTS;
IV. THIRD-PARTY DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS; AND
V. THIRD-PARTY DEFENDANTS MOTION FOR SUMMARY JUDGMENT AGAINST THIRD-PARTY PLAINTIFFS
INTRODUCTION
Plaintiffs Farragut Mortgage Co., Inc. (“Farragut”) and the Farragut Shareholders (“Farragut Shareholders”) filed this action against defendants Arthur Andersen LLP and Michael Devlin, a partner (collectively “Arthur Andersen”), for misrepresenting and providing erroneous accounting advice with respect to a contemplated merger transaction between Farragut and J.I. Kislak, Inc. (“Kislak”).
Arthur Andersen brought a third-party claim against Kislak and KPMG Peat Marwick LLP (“KPMG”), the accounting firm that represented Kislak in the proposed merger, for negligently providing Arthur Andersen with an erroneous opinion and misrepresenting Kislak’s eligibility and qualification to merge using pooling-of-interests accounting.
The Farragut Shareholders subsequently filed a claim against third-party defendant KPMG for negligently misrepresenting Kislak’s eligibility and qualifications to merge using pooling-of-interests accounting.
Farragut now moves for partial summary judgment against defendants Arthur Andersen and third-party defendant KPMG; Arthur Andersen moves for summary judgment against Farragut; the Farragut Shareholders move for summary judgment against KPMG; and third-party defendant KPMG moves for summary judgment against the Farragut Shareholders and third-party plaintiffs Arthur Andersen.
For the reasons set forth below: (i) Farragut’s motion for partial summary judgment against Arthur Andersen is DENIED; (ii) Arthur Andersen’s motion for summary judgment against Farragut is ALLOWED in part, and DENIED in part; (iii) Farragut Shareholders’ motion for partial summary judgment against KPMG is DENIED; (iv) KPMG’s motion for summary judgment against the Farragut Shareholders is ALLOWED; and (v) KPMG’s motion for summary judgment against Arthur Andersen is ALLOWED.
BACKGROUND
Farragut Mortgage Co., Inc, a business incorporated in Massachusetts, was engaged in the residential mortgage banking business. This involved the origination, purchase, sale and servicing of residential mortgage loans. In early 1993, Farragut sought to increase shareholder value and to minimize the recent losses the company incurred. Farragut hired an investment bank, Adams & Co., to solicit proposals to find a buyer. Adams & Co. targeted 250 different *286 parties, of which 38 companies expressed an interest and responded to the solicitation. Farragut eventually executed a confidentiality agreement with the interested parties and four prospective bidders emerged. Some of the bidders offered to purchase the company for approximately $5.00 per share. J.I. Kislak, Inc., a privately held mortgage company, incorporated in New Jersey and headquartered in Florida, proposed a merger deal with Farragut. Similar to Farragut, Kislak also engaged in the mortgage banking business. The proposed merger would leave Kislak, to be named Kislak Financial, Inc., as the surviving entity. Farragut terminated negotiations with the other bidders to pursue the merger proposed by Kislak.
In the spring of 1993, Kislak and Farragut began negotiating a merger agreement. The merger was to be accomplished by the issuance of new shares of Farragut stock to Kislak’s shareholders in exchange for their shares of Kislak stock. Kislak offered the Farragut Shareholders $6.00 per share. The exchange would give Kislak shareholders an 88.8% ownership interest in the combined entity, and the Farragut shareholders would own the remaining 11.2% of the combined entiiy. One of the conditions of the merger, as established by Kislak, is that the deal must qualify for “pooling-of-interests" accounting.
The criteria for the pooling method accounting relate to the attributes of the combining enterprises before the combination, the manner of combining the enterprises, and the absence of certain planned transactions after the combination. See generally Financial Accounting Standards Board, CurrentText, Accounting Standards June 1, 1996, Section B50 (1996). The pooling-of-interest method accounts for a business combination as the uniting of the ownership interests of two or more companies by exchange of equity securities. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents. Ownership interests continue and the former bases of accounting shall be retained. The recorded assets and liabilities of the constituents shall be carried forward to the combined corporation at their recorded amounts. Income of the combined corporation shall include income of the constituents for the entire fiscal period in which the combination occurs. The reported income of the constituents for prior periods shall be combined and restated as income of the combined corporation.
The pooling-of-interests method of accounting is intended to present as a single interest two or more common stockholder interests that were previously independent and the combined rights and risks represented by those interests. Id. at B50.104. That method shows that stockholder groups neither withdraw nor invest assets but in effect exchange voting common stock in a ratio that determines their respective interests in the combined enterprise. “A business combination that meets all of the conditions specified and explained in paragraphs B50.105 through B50.107 shall be accounted for by the pooling-of-interests method.” Id. (Emphasis in the original.)
Under this method of accounting, the surviving entity will not have to take on to its balance sheet the good will created in the other company as a result of the merger. If the surviving entity did have to take that good will on to its balance sheet, it would have to write down that good will in the future, negatively affecting the reported earnings of the surviving entity.
According to the Financial Accounting Standards Board, there are two essential attributes for combining enterprises: (1) each of the combining enterprises should be autonomous and not been a subsidiary or division of another enterprise within two years before the plan of combination is initiated; and (2) each of the combining enterprises should be independent of the other combining enterprises. Id. at B50.105.
Farragut hired the public accounting firm Arthur Andersen to review the merger between Farragut and Kislak. In order to evaluate whether the merger between Farragut and Kislak could be accounted for as a pooling-of-interests, it was necessary to evaluate: (i) the pre-combination attributes of Farragut; (ii) the pre-combination attributes of Kislak; and (ill) the structure of the merger. Prior to signing the Merger Agreement on July 2, 1993, Farragut relied on Arthur Andersen’s representation that the merger between Kislak and Farragut should qualify for pooling-of-interests accounting.
As Farragut’s accountant, Arthur Andersen was to conduct two functions. First, Arthur Andersen was to advise Farragut regarding the pre-merger pooling evaluation of the deal, pursuant to Section 5.15 of the Merger Agreement, and determine, based on the facts and circumstances known to it at the time, as to whether Farragut could participate in the merger transaction and if that merger would qualify for pooling-of-interests accounting. In essence, Arthur Andersen was to advise Farragut, prior to the signing of the Merger Agreement on July 2, 1993, whether the merger as contemplated would qualify for pooling-of-interests accounting. Section 5.15 states as follows:
Pooling-of-interests Accounting. [Farragut] has requested its auditors, Arthur Andersen & Co., to review [Farragut’s] statements of financial condition, results of operations and stockholder’s equity for the past two years (including, without limitation, the ownership of and transactions in capital stock of [Farragut]), together with this Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and thereby, for the purpose of evaluating and determining whether there is any reason why the Merger, as provided for under the terms and provisions of this Agreement, may not be accounted for as a “pooling-of-interests.”
*287 Second, Arthur Andersen was to render a final written opinion at the close of the merger which indicated that the deal would qualify for pooling-of-interests accounting. See Section 8.2 of the Merger Agreement. Section 8.2 states as follows:
Conditions to Obligations of the Company to Effect the Merger. The obligation of [Farragut] to effect the Merger shall be subject to the satisfaction at or prior to the Effective Time of the following additional conditions:
(c) Accountants’ Pooling Letter. [Farragut] shall have received a letter, dated the Effective Time, from the Company’s auditors [Arthur Andersen], addressed to the Company and reasonably satisfactory to them, to the effect that the Merger will qualify for “pooling-of-interests” accounting treatment under generally accepted accounting principles.
Commencing shortly after May 21, 1993, Arthur Andersen reviewed drafts of the merger agreement, which contained a requirement that the merger qualify for pooling-of-interests accounting. The deal would proceed so long as the accounting firms for both parties agreed that the merger would be treated as pooling-of-interests accounting.
Similarly, Kislak retained KPMG, its outside auditor of several years, to review the merger transaction and provide a pre-merger pooling opinion and evaluate whether the proposed merger deal would qualify for pooling-of-interests accounting, pursuant to section 4.8 of the Merger Agreement. Section 4.8 of the Merger Agreement states part:
In order to induce [Farragut] to enter into this Agreement, KISLAK represents and warrants to, and agrees with [Farragut] as follows:
Pooling-of-interests Accounting. KISLAK has requested its auditors, KPMG ..., to review KISLAK’s statements of financial condition, results of operations and stockholder’s equity for the past two years (including, without limitation, the ownership of and transactions in capital stock of KISLAK), together with this Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and thereby, for the purpose of evaluating and determining whether there is any reason why the Merger, as provided for under the terms and provisions of this Agreement, may not be accounted for as a “pooling-of-interests."
In accordance with section 8.3(c) of the Merger agreement, KPMG was also required to render a final written opinion at the merger closing which would confirm that the deal qualified for pooling-of-interests accounting. Section 8.3(c) states as follows:
Conditions to Obligations of the Compe ny to Effect the Merger. The obligation of [Kislak] to effect the Merger shall be subject to the satisfaction at or prior to the Effective Time of the following additional conditions:
(c) Accountants’ Pooling Letter. [Kislak] shall have received a letter, dated the Effective Time, from the Company’s auditors [KPMG], addressed to the Company and reasonably satisfactory to them, to the effect that the Merger will qualify for “pooling-of-interests” accounting treatment under generally accepted accounting principles.
KPMG and Arthur Andersen were not parties to the Merger Agreement. However, if either of the accounting firms believed that the merger would not qualify for pooling-of-interests accounting, then the deal could be terminated. Both accounting firms represented to their respective clients, that “based upon all the facts and circumstances known to them as of July 2, 1993, the merger should qualify for pooling-of-interests accounting treatment under generally accepted accounting principles.” The Merger Agreement was signed by Kislak and Farragut on July 2, 1993.
The Merger Agreement contained several conditions which the parties had to comply with prior to the closing of the deal. The conditions included: (i) that the merger be accounted for as a “pooling-of-interests” between Kislak and Farragut; (ii) Farragut could not sell off assets during the pendency of the deal, other than in the course of ordinary business; and likewise, Jay Kislak, the majority shareholder of Kislak,[4] could not dispose of shares of Kislak stock until after the consummation of the proposed merger (shareholder lock-up agreement); (iii) Farragut’s corporate value must meet a certain “net worth” at the time of the closing; and (iv) the closing of the proposed merger was to be completed by November 30, 1993. Farragut entered into this agreement under the presumption that the merger proposal would qualify for pooling-of-interests accounting because the opinions given by Arthur Andersen and KPMG indicated that the pre-qualification attributes of Farragut and Kislak would allow the merger to be accounted for as a pooling-of-interests.
After the Merger Agreement was executed, market events caused Farragut to suffer financial losses. In particular, Farragut’s most important asset, its loan servicing portfolio, was significantly reduced. Consequently, Farragut issued a press release indicating it had suffered financial losses of $1.9 million for the six months ended June 30, 1993.[5]
During this market downturn, the parties agreed to amend the Merger Agreement. On August 27, 1993, the parties amended the Merger Agreement to include a “minimum net worth” test. Kislak could terminate the merger in the event that Farragut suffered a "material adverse” change to its financial condition and failed to meet a minimum net worth. A change in Farragut’s financial condition would not be considered material so long as the stockholders’ equity of Farragut equaled or exceeded $10.3 million and the Adjusted Tangible Net Worth of Farragut equaled or exceeded $9.0 million. The parties also amended the closing *288 date, and changed it from November 30, 1993 to December 31, 1993.
In addition, during this period, the parties also undertook, with their counsel, to draft the Farragut S-4 Registration Statement to submit to the Securities and Exchange Commission (“SEC”). In accordance with the requirements of the Securities Act of 1933, the proposed merger could not close unless the SEC declared the Registration Statement effective. The Registration Statement had to be deemed effective by the SEC before it could be issued to the public, and it had to be issued to the public at least 20 days before the transaction could be consummated. Before declaring the Registration Statement effective, the SEC had to approve pooling-of-interests accounting in the proposed merger; but it could also preclude the proposed merger from pooling treatment. The SEC also had the authority to require Farragut to restate the S-4 Registration Statement until the SEC was satisfied with the terms and disclosures of the Registration Statement. On August 31, 1993, the companies submitted a draft S-4 Registration Statement to the SEC for comments.
The S-4 Registration Statement included statements that explained the recent market events that caused a deterioration in Farragut’s financial conditions. The S-4 characterized the deterioration in Farragut’s financial status as “recent” changes and also disclosed that Farragut was projecting further losses. The Registration Statement stated that: (i) certain of Kislak’s existing shareholders were also shareholders of Kislak National Bank (KNB); (ii) the majority shareholder of Kislak was identified as Jay Kislak, with a controlling 51.4% beneficial interest; and (iii) Jay Kislak was also Chairman of KNB’s Board of Directors.[6] On October 14, 1993, the SEC responded to the draft S-4 Registration Statement and raised 108 questions. Five questions related to pooling treatment. The SEC indicated that “it appears that the merger would not qualify for pooling treatment.” The SEC raised issues regarding the eligibility of Farragut to participate in a pooling of interest transaction. The SEC also raised questions about whether Jay Kislak, Kislak, and Kislak National Bank (KNB) were autonomous.[7]
On or about October 27, 1993, the parties responded to the SEC comments. The response letter indicated that prior to filing the S-4 Registration Statement, meetings were held by both companies, with their respective external accountants, to “discuss the applicability of pooling-of-interests accounting,” and “both . . . independent certified public accountants believe that . . . the proposed merger qualifies [for pooling treatment].”
Additionally, for the period ended October 31,1993, the record shows that the Farragut shareholders’ equity fell below $10.3 million and its Adjusted Tangible Net Worth was below $9.0 million — Farragut’s net worth was approximately $2.9 million below the requisite amount needed to close the deal. Concerned that Farragut might not meet the minimum net worth as required by the Amended Merger Agreement, on October 28, 1993, Kislak contacted Farragut by letter and “solicited” its views as to whether Farragut would be able to meet the minimum “net worth test” as set forth in the “material adverse change” clause.
On November 17, 1993, the SEC issued another comment letter regarding the proposed merger. The SEC specifically requested that the parties’ response discuss “all other significant matters that were identified by both [Kislak and Farragut] and the external auditors that could lead to the preclusion of the pooling of interest method of accounting.” The SEC wanted a more detailed explanation of how the proposed merger would qualify for pooling-of-interests accounting, and not just a listing of the criteria used by the accounting firms.
At this time, KPMG also discussed with Kislak that the SEC might take the position that; (i) Jay Kislak, the majority shareholder of Kislak, could be considered a personal holding company of Kislak, as well as of the other entities in which Jay Kislak had an ownership interest — particularly KNB and Skylake Bank; and (ii) KNB and/or Skylake Bank also engaged in the mortgage business. Due to the significant transactions between Kislak and KNB, and the common ownership, there existed a potential issue as to whether Jay Kislak would be considered a “parent” with two “subsidiaries” (Kislak and KNB) — thus calling into question whether they were autonomous so as to qualify for pooling-of-interests accounting. KPMG opined that if the SEC took the position that Jay Kislak was the “parent” of Kislak and KNB, then the SEC might conclude that the Kislak did not satisfy the autonomy requirement for pooling-of-interests method of accounting. The autonomy attribute requires that each of the combining companies be autonomous and not have a subsidiary of another company within two years prior to the proposed transaction. The SEC, therefore, could potentially preclude the pooling-of-interests accounting treatment for these reasons.
By letter dated November 17, 1993, Kislak informed Farragut that KPMG, for the first time, brought to Kislak’s attention that there may be issues which may adversely impact the opinion that the companies would qualify for pooling treatment. Specifically, Kislak informed Farragut that KPMG had raised concerns regarding Kislak’s autonomy.
By letter dated November 23, 1993, Arthur Andersen requested information from KPMG regarding KPMG’s “expressed concerns” that the merger would not qualify for pooling treatment. During the pendency of this deal, Arthur Andersen did not investigate Kislak’s eligibility to qualify for pooling-of-interests accounting; Arthur Andersen looked only at *289 Faixagut’s eligibility to qualify for pooling-of-interests accounting.
As of December 3, 1993, 23 of the 108 comments raised by the SEC remained unanswered. A draft response to the SEC comments of November 17, 1993 was completed December 9, 1993.
On December 15, 1993, Arthur Andersen informed Farragut of the uncertainty of Kislak’s eligibility to meet the pooling requirement, and advised Farragut to seek SEC pre-clearance approval.[8] Similarly, KPMG advised Kislak to seek SEC pre-clearance. KPMG also prepared a draft response to the SEC comments and stated that “Kislak believes that... Jay Kislak should not be considered a ‘parent’ of Kislak and KNB under the autonomy condition for pooling-of-interests accounting because the two entities are [in] two separate ‘lines of business.’ ” The proposed merger requires that both accounting firms agree that the deal would qualify under a method of pooling-of-interests accounting.
On December 17, 1993, Farragut and Kislak entered into a termination agreement.[9] The termination agreement indicated that the deal was terminated because the transaction could not be completed by December 31,1993, as stipulated in the Merger Agreement. As of December 17, 1993, Farragut common stock, as traded on the American Stock Exchange, was listed at l[3]/4 per share.
On November 10, 1995, Farragut, acting with the authority of the Bankruptcy Court as a debtor in possession, initiated this action against Arthur Andersen.
On May 2, 1996, Arthur Andersen filed a third-party claim against Kislak and KPMG.
On November 15, 1996, this court (Kottmyer, J.) denied Arthur Andersen’s motion to dismiss Farragut’s claims for (i) breach of contract, (ii) breach of the implied covenant of good faith and fair dealing, (iii) negligent misrepresentations, (iv) negligence and (v) violations of Chapter 93A.
On January 14, 1997, Farragut and the Shareholders filed, pursuant to Mass.R.Civ.P. 14, a claim against third-party defendant KPMG. On July 21, 1997, this court (Welch, J.) dismissed Farragut’s claims against KPMG under the broad release agreement executed by Farragut in the Termination Agreement, but let stand the Shareholders’ claims for (i) negligent misrepresentations, (ii) negligence and (iii) violations of Chapter 93A.
This action is before this court on (i) Farragut’s motion for partial summary judgment against Arthur Andersen; (ii) Arthur Andersen’s motion fc r summary judgment against Farragut; (iii) the Farragut Shareholders’ motion for partial summary judgment against KPMG; (iv) KPMG’s motion for summaryjudgement against the Farragut Shareholders; and (v) KPMG’s motion for summary judgment against Arthur Andersen.
DISCUSSION
I. Summary Judgment Standard
The standard of review of a grant for summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as matter of law. Baybank v. Bornhofft, 427 Mass. 571, 573 (1998), citing Augut, Inc. v. Liberty Mutual Ins. Co., 410 Mass. 117, 120 (1991). A party moving for summary judgment which does not bear the burden of proof at trial may show the absence of a triable issue either by submitting affirmative evidence negating an essential element of the moving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The party opposing summary judgment must adequately bring any factual disputes to the attention of the trial judge. Dupont v. Dracut, 41 Mass.App.Ct. 293, 297 (1996), citing Berry v. Dawes, 34 Mass.App.Ct. 506, 508 n.3 (1993). These disputed facts must be supported by affidavits or other documents. Mass.R.Civ.P. 56. See also Dupont v. Dracut, supra at 297. “[B]are assertions and conclusions regarding [an individual’s] understandings, beliefs, and assumptions are not enough to withstand a well-pleaded motion for summary judgment.” Polaroid Corp. v. Rollins Envtl. Servs. (N.J.), Inc., 416 Mass. 684, 696 (1993).
II. Farragut’s Motion for Partial Summary Judgment against Arthur Andersen and Arthur Andersen’s Motion for Summary Judgment against Farragut
Farragut argues that it is entitled to partial summary judgment against Arthur Andersen on the following issues; (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; (iii) negligent misrepresentations; (iv) negligence; and (v) violation of Chapter 93A.
Conversely, Arthur Andersen argues it is entitled to summary judgment on those same issues. In addition, Arthur Andersen argues that Farragut released Arthur Andersen from any and all claims as set forth in the Termination Agreement the parties made on December 17, 1993. Furthermore, Arthur Andersen asserts that Begley’s[10] claim should be dismissed because he was not a shareholder at the time of the alleged wrongful act.
A. Breach of Contract
Farragut contends that this court should find Arthur Andersen liable as a matter of law on its claim that Arthur Andersen breached its contract. Farragut *290 argues that Arthur Andersen was hired to review the Merger Agreement and the documents relating to the proposed merger deal and to determine whether there were any reasons why the merger might not be accounted for as a pooling-of-interests, but Arthur Andersen breached its contract when it failed to look at the full scope of the merger transaction. Specifically, Arthur Andersen breached its duty when it failed to look into the pooling eligibility of Kislak. Farragut argues that the Merger Agreement required Arthur Andersen to review the Merger Agreement, the Stock Agreement, the Kislak Shares Agreement and the transactions contemplated hereby and thereby, and, therefore, it required that Arthur Andersen review not only Farragut’s pre-merger pooling attributes but also Kislak’s pre-merger pooling attributes.
Farragut further contends that Arthur Andersen breached its duty by not discovering the potential autonomy problem Kislak might have because of Jay Kislak’s majority control over Kislak, KNB, and Sky-lake Bank. Farragut argues that had Arthur Andersen investigated Kislak and reviewed the Kislak Shares Agreement, Arthur Andersen would have seen the “red flag" and known of the potential problems for accounting for the merger as a pooling-of-interests.
Arthur Andersen, however, asserts that the agreement did not require it to provide an opinion as to Kislak’s pooling attribute. Arthur Andersen maintains that it was hired to review Farragut’s pre-merger pooling eligibility and not Kislak’s pre-merger pooling eligibility — KPMG was the accounting firm hired by Kislak and, therefore, was responsible for evaluating Kislak’s pooling attribute and eligibility. Arthur Andersen contends that since it was not hired to evaluate Kislak’s pooling attribute, it did not breach its contract with Farragut.
The terms of the agreement read, in part, as follows:
[Arthur Andersen shall review] [Farragut’s] statements of financial condition, results of operations and stockholder’s equity for the past two years (including, without limitation, the ownership of and transactions in capital stock of [Farragut]), together with this Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and thereby, for the purpose of evaluating and determining whether there is any reason why the Merger, as provided for under the terms and provisions of this Agreement, may not be accounted for as a “pooling-of-interests.”
The interpretation of a contract presents a question of law for the court, except to the extent disputed facts bear upon such interpretation. Lumber Mutual Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995); USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The essential elements of a contract must be sufficiently definite so that the nature and obligations of the parties are ascertainable. Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F.Supp. 404, 417 (D.Mass. 1995). The court cannot ignore the basic rule of construction and must give effect to the parties’ intentions and construe the language to give it reasonable meaning whenever possible. Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981) (a contract should not be interpreted so as to render any of its terms meaningless). In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position the parties occupied at the time the contract was made. See Restatement (Second) on Contracts, §202, comment b.
Both Farragut and Arthur Andersen argue that the terms of the agreement are unambiguous and should be given their plain meaning. However, both parties construe the terms of the agreement differently, and the record does not shed light as to the scope of Arthur Andersen’s obligations. Farragut argues that the terms of the agreement required Arthur Andersen to look at Farragut’s financial condition together with the “[Merger] Agreement, the Stock Agreement, the KISLAK Shares Agreement and the transactions contemplated hereby and thereby," which, as Farragut argues, required that Arthur Andersen also review the Kislak documents and records which pertain to the merger transaction. (Emphasis added.) Conversely, Arthur Andersen argues that the agreement only required Arthur Andersen to review Farragut’s pooling eligibility and Farragut’s side of the merger, while KPMG was hired to look at Kislak’s pooling eligibility and Kislak’s side of the transaction. There exists a triable issue as to the scope of the contractual obligation Arthur Andersen owed to Farragut as contemplated by the agreement.
Furthermore, a determination of a breach of contract, if any, is properly reserved for the fact finder to resolve at trial. “[W]hether a party substantially complied with the terms of a contract or whether the actions of a party constitute a material breach is a question of fact." O’Connell ManagementCo. v. Carlyle-XIII Managers, Inc., 765 F.Supp. 779, 783 (D.Mass. 1991), citing Cetrone v. Paul Livoli, Inc., 337 Mass. 607, 610 (1958). Farragut’s partial motion for summary judgment against Arthur Andersen for breach of contract is denied. Likewise, Arthur Andersen’s motion for summary judgment in opposition to Farragut’s claim for breach of contract is also denied.
B. Breach of the Implied Covenant of Good Faith and Fair Dealing
Farragut argues that this court should find as a matter of law that Arthur Andersen breached the implied covenant of good faith and fair dealing when it failed: (1) to investigate and evaluate Kislak’s autonomy and eligibility to participate in a pooling transaction, and (2) to inform Farragut that Kislak might not be eligible for pooling-of-interests accounting, when it should have know of this potential problem based upon the information disclosed in the Kislak Shares Agreement and the S-4 Registration Statement.
*291 Arthur Andersen argues that its actions were not made in bad faith, nor did it act dishonestly or for a fraudulent purpose. Furthermore, Arthur Andersen contends that gross negligence is not sufficient to maintain a claim for breach of the implied covenant of good faith and fair dealing. Arthur Andersen also contends that there cannot be a finding of gross negligence when KPMG also opined that the merger would qualify for pooling-of-interests accounting, and the SEC did not conclude that the merger would not qualify for pooling treatment.
Under Massachusetts law, parties to a contract are required to abide by the strictures of good faith and fair dealing that are implied in every contract. Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991). The covenant requires that “neither party shall do anything that will have the[1] effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Id.
The undisputed record shows that Arthur Andersen did not investigate into Kislak’s side of the merger transaction. Arthur Andersen made a representation to Farragut that it believes the deal should qualify for pooling-of-interests based upon Arthur Andersen’s review of the Merger Agreement, the Stock Agreement, the Kislak Shares Agreement and the transaction contemplated hereby and thereby. A triable issue exists as to whether Arthur Andersen violated the implied covenant of good faith and fair dealing by not looking at Kislak’s side of the merger.
Farragut’s motion for partial summary judgment against Arthur Andersen claiming that Arthur Andersen breached the implied covenant of good faith and fair dealing as a matter of law is denied. Arthur Andersen’s motion for summary judgment as to its claim that as a matter of law it did not violate the covenant of good faith and fair dealing is also denied.
C. Negligent Misrepresentations
Farragut claims that as a matter of law Arthur Andersen is liable to Farragut because it made negligent misrepresentations when it falsely represented to Farragut that: (i) it reviewed the Kislak Shares Agreement and “the transactions contemplated hereby and thereby, for the purpose of evaluating and determining whether there is any reason why the merger would not qualify for as a ‘pooling-of-interests’ and (ii) the merger would qualify for “pooling-of-interests” accounting treatment under generally accepted accounting principles. Farragut argues that Arthur Andersen’s representations were untrue because it failed to review a significant part of the “transactions as contemplated,” because it did not review whether Kislak was autonomous, and that Arthur Andersen knew or should have known the reasons why the merger may not be accounted for as a pooling-of-interests, yet Arthur Andersen still represented that the merger would so qualify.
In order to recover for negligent misrepresentations the plaintiffs must prove that the defendants (1) in the course of business, (2) supplied false information for the guidance of others (3) in their business or transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and that they (6) failed to exercise reasonable care or competence in obtaining or communicating the information. Golber v. BayBank Valley Trust Company, 46 Mass.App.Ct. 256, 257 (1999); See also Nycal Corporation v. KPMG Peat Marwick LLP, 426 Mass. 491, 496 (1998) (the Supreme Judicial Court adopts the liability standards for negligent misrepresentations embodied by the Restatement (Second) of Torts §552 (1977)[11]). “A person who makes representations under circumstances where he knows that the person receiving the representations will be relying on them, has a duty to exercise reasonable care in making the representations.” Golber supra at 258.
In some circumstances, “a statement that in form is one of opinion may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it.” McEneaney v. Chestnut Hill Realty Corp., 38 Mass.App.Ct. 573, 575 (1995); Restatement (Second) of Torts §539.[12] See also Restatement (Second) of Torts §538A.[13] “This is particularly true where the maker is understood to have special knowledge of facts unknown to the recipient.” Id. A claim for negligent misrepresentations is ordinarily one for the a jury, unless the undisputed facts are so clear as to permit only one conclusion. Fox v. F&J Gattozi Corp., 41 Mass.App.Ct. 581, 588 (1996).
In this action, there is no doubt that Arthur Andersen was aware that it was rendering an opinion which it knew Farragut would rely upon — Farragut hired Arthur Andersen to provide an opinion on the issue of pooling-of-interests accounting. However, Arthur Andersen did not supply any false information that would allow a claim for negligent misrepresentations. (Emphasis added.) Arthur Andersen’s representations were one of an unactionable opinion. See Restatement (Second) of Torts §538A, comment b.
Arthur Andersen was hired to review the corporate financial records and other documents and transactions as contemplated by the proposed merger. Arthur Andersen issued an opinion as to whether, in its professional judgment, the Farragut/Kislak merger would qualify for pooling-of-interests accounting. Arthur Andersen opined that the merger should qualify for pooling-of-interests accounting.
Although Arthur Andersen represented that the merger should be treated as a pooling of interest, it is the SEC which ultimately issues the final decision on that matter. It is the SEC which will declare the Registration Statement effective or not. It is also the SEC which ultimately decides whether the merger *292 would qualify for pooling-of-interests treatment. Arthur Andersen’s representation is only an opinion, that in its professional judgment, it believes the Farragut/Kislak merger should qualify for pooling-of-interests accounting and that the SEC would agree with that opinion. Although Arthur Andersen’s representation maybe based on facts — the information disclosed in the company’s financial records and documents — it is no more than its belief on how the SEC would ultimately decide the issue of treating the proposed merger as a pooling-of-interests. The fact is, the accounting firms can only predict how the SEC would ultimately decide the pooling-of-interests accounting issue. It is a matter of judgment and opinion. The SEC’s decision to declare that the merger would qualify for pooling-of-interests accounting is not something that the accounting firm can predict with absolute certainty.
Furthermore, the record does not show that Arthur Andersen’s opinion was an actionable misrepresentation. Arthur Andersen provided an opinion that it believed the merger should qualify for pooling treatment. KPMG, likewise, represented to its client, Kislak, that the merger should qualify for pooling-of-interests accounting. Although the SEC raised questions regarding Kislak’s autonomy, which may affect the poolability of the merger, it did not state that the merger would not qualify for pooling treatment. Arthur Andersen’s representation was one of an opinion, in which the falsity or truthfulness cannot be ascertained. In this present action, there was no false representation, nor a negligent misrepresentation— KPMG did not disagree with Arthur Andersen nor did the SEC determine that the deal was not poolable.
Farragut’s claim that Arthur Andersen made negligent misrepresentations as a matter of law is denied. Arthur Andersen’s motion that it is entitled to judgment as a matter of law in its opposition to Farragut’s negligent misrepresentation claim is allowed.
D. Negligence
Farragut argues that Arthur Andersen, as a matter of law, negligently represented Farragut in the merger transaction. Farragut argues that Arthur Andersen was negligent because it failed to bring to Farragut’s attention the reasons why the merger might not qualify for pooling-of-interests accounting. Arthur Andersen owed a duty of care to Farragut (1) to evaluate the pooling criteria applicable to the merger, including the Kislak’s eligibility to participate, and (2) to inform Farragut of all the reasons Arthur Andersen knew or should have known that would interfere with the merger’s pooling qualifications.
It is undisputed that Farragut hired Arthur Andersen to represent it in the proposed merger transaction with Kislak. This court finds, as a matter of law, that Arthur Andersen owed Farragut a duty to use due care in representing Farragut’s interest in the merger deal. See Wallace v. Wilson, 411 Mass. 8, 12 (1991) (a determination of duty is a question of law). The record also shows that Arthur Andersen only reviewed Farragut’s statement of financial conditions and the records and the documents relating to Farragut’s side of the deal, but did not investigate into Kislak’s side of the merger. Farragut contends that Arthur Andersen breached its duty because it did not investigate or review Kislak’s side of the transaction. Arthur Andersen maintains that the Merger Agreement did not require it to investigate Kislak’s pre-merger pooling attributes and that it was hired to review only Farragut’s pre-merger pooling attributes, while KPMG was hired by Kislak to review Kislak’s pre-merger pooling attributes. This dispute raises questions of fact.
The scope of Arthur Andersen’s duty and whether Arthur Andersen breached that duty is reserved for trial.
Farragut’s claim that this court should find summary judgment in its favor and against Arthur Andersen for negligence is denied. Similarly, Arthur Andersen’s claim that it is entitled to summary judgment on Farragut’s negligence claim is also denied.
E. Violations of Chapter 93A, Unfair or Deceptive Acts
Farragut argues that Arthur Andersen engaged in unfair or deceptive acts in violation of G.L.c. 93A when it misled Farragut into believing that it reviewed the transactions contemplated by the proposed merger to evaluate and determine whether the deal qualified for pooling. Farragut asserts that Arthur Andersen’s alleged gross indifference and conscious disregard of the potential pooling problems, which Arthur Andersen knew or should have known based upon the information provided to it in the Kislak Shares Agreement and the S-4 Registration Statement, constitutes the kind of misconduct which Chapter 93A is designed to redress.
To be actionable under the Massachusetts statute prohibiting unfair trade practices, objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce. Johnson v. Koplosky Foods, Inc., 5 F.Supp.2d 48, 55 (D.Mass. 1998). A Chapter 93A plaintiff must show that defendant’s actions fell within at least the penumbra of some common-law, statutory or other established concept of fairness, or were immoral, unethical, oppressive or unscrupulous, and resulted in substantial injury. Id. Whether a given trade practice is unfair or deceptive must be determined from the circumstances of each case. Noyes v. Quincy Mutual Fire Ins., Co., 7 Mass.App.Ct. 723, 726 (1979).
An act is “deceptive” if it could reasonably be found to have caused the person to act differently from the way he otherwise would have acted. Lowell Gas Co. v. Attorney General, 377 Mass. 37, 51 (1979). A mere breach of contract does not, in and of itself, rise to the *293 level of a violation of Chapter 93A. Whitinsville Plaza, Inc. v. Kotseas 378 Mass. 85, 100-01 (1979). See also Framingham Auto Sales, Inc. v. Workers’ Credit Union, 41 Mass.App.Ct. 416, 418 (1996) (mere breach of legal obligation, without more, does not amount to unfair an deceptive trade practice). A negligent act, standing by itself, does not give rise to a claim under unfair or deceptive acts or practices; there must in addition be evidence that negligence resulted in unfair and deceptive act or practice. Squeri v. McCarrick, 32 Mass.App.Ct. 203, 207 (1992).
Farragut argues that Arthur Andersen’s gross indifference and conscious disregard of the pooling problem constituted an unfair and deceptive act or practice in violation of Chapter 93A. Farragut further argues that Arthur Andersen’s “gross negligence” in the performance of its professional services also violated Chapter 93A.
A question of fact exists as to whether it was an unfair and deceptive act or practice, and in violation of Chapter 93A, for Arthur Andersen to opine that the proposed merger qualified for pooling treatment after Arthur Andersen reviewed the Merger Agreement and the “transaction [as] contemplated hereby and thereby,” when the record shows that Arthur Andersen did not look at Kislak’s side of the merger deal. Farragut’s motion for partial summary judgment claiming that Arthur Andersen violated Chapter 93A as a matter of law is denied. Likewise, Arthur Andersen’s motion for summary judgment dismissing Farragut’s claim for violation of Chapter 93A is also denied.
F. Farragut Released Its Claim against Arthur Andersen in the Termination Agreement
Arthur Andersen argues that it is entitled to summary judgment because the Termination Agreement entered into on December 17, 1993 by Farragut and Kislak discharges Arthur Andersen from any liability. The Termination Agreement states in part;
Farragut does hereby.. . discharge Kislak, ... and any other person or entity who together with such released parties may be jointly liable therewith to Farragut, . . . from all actions, . . . [or] claims . . . which Farragut. . . ever had . . . against Kislak . . . and any other person or entity who together with such released parties may be jointly liable therewith to Farragut..."
The interpretation of a contract presents a question of law for the court, except to the extent disputed facts bear upon such interpretation. Lumber Mutual Ins., Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). The terms of the release clearly discharges Kislak and those who may be jointly liable with Kislak. Arthur Andersen, however, would not be jointly liable — the agreement does not release Arthur Andersen, whom Farragut hired to represent it in the merger transaction.
Arthur Andersen’s motion for summary judgment based on its contention that it was released from liability is denied.
G. George Begley’s Claim Should Be Dismissed as a Matter of Law
Arthur Andersen contends that it is entitled to summary judgment as to the claim of George Begley (“Begley”) because he was not a shareholder at the time of the alleged misconduct and therefore has no standing to bring a claim against Arthur Andersen.
The undisputed facts show that Begley was not the record owner of any Farragut stock, and any stock owned by Begley was owned by Begley’s wife. Begley, therefore, has no standing to bring this action as a matter of law.
III. Farragut Shareholders’ Motion for Partial Summary Judgment against Third-Pariy Defendant KPMG and KMPG’s Motion for Summary Judgment against Farragut
The Farragut Shareholders[14] argue that they are entitled to partial summary judgment against KPMG for (i) negligent misrepresentation, (ii) negligence and (iii) violations of Chapter 93A.
Conversely, KPMG argues that it is entitled to summary judgment on those same claims. KPMG also argues that it is entitled to summary judgment against the plaintiffs because (i) the Farragut Shareholders’ claims are derivative of those of the Farragut corporation and therefore should be dismissed and (ii) the claims were brought after the expiration of the statute of limitations and are therefore time barred.
A. Farragut Shareholders’ Claim against KPMG for Negligent Misrepresentation
The Farragut Shareholders assert that KPMG negligently misrepresented the pooling treatment of the merger, and that they should have known of the Kislak autonomy problem which would have raised the “red flag” as to whether the proposed merger could be accounted as a pooling-of-interests. The Farragut Shareholders further argue that KPMG knew, or should have known, that Farragut and Arthur Andersen would rely on KPMG’s opinion regarding the pooling treatment.
As discussed, supra in section II-C, the standard for bringing an action for negligent misrepresentation is set forth in Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491 (1998). Under the Nycal standard, an accountant’s potential liability, in a noncontractual third-party case, is limited to those noncontractual third parties who can demonstrate "actual knowledge on the part of the accountants of the limited — though unnamed — group of potential [third parties] that will rely upon the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence.” 426 Mass. at 498, quoting First Nat’l Bank of Commerce v. Monaco Agency, Inc., 911 F.2d 1053, 1062 (5th Cir. 1990). “The *294 accountant’s knowledge is to be measured ‘at the moment the audit [report] is published, not by the foreseeable path of harm envisioned by [litigants] years following an unfortunate business decision.’ ” Id., quoting First Nat’l Bank of Commerce v. Monaco Agency, Inc., supra at 1059.
In this action, the record shows that KPMG was aware that the proposed merger required that both accounting firms issue an opinion as to whether the merger would qualify for pooling-of-interests accounting — KPMG was to issue a pooling opinion in conjunction with Arthur Andersen’s issuance of a pooling opinion — and that KPMG was aware that the deal was structured in a way that both accounting firms needed to agree as to poolability or the deal would be terminated. KPMG, therefore, knew that the merger transaction relied on KPMG’s pooling opinion.
However, as discussed supra in section II-C, similar to Arthur Andersen’s representation, KPMG’s representation that the merger should qualify for pooling-of-interests accounting is a nonactionable opinion. KPMG’s professional judgment was that it believed the SEC would allow for pooling-of-interests accounting. KPMG’s opinion as to how the SEC would rule with respect to the pooling-of-interests issue is not a false statement, but merely a prediction as to the SEC’s future determination.
Furthermore, and as KPMG argues, KPMG did not make any false statement or a misrepresentation. KPMG opined that the merger should qualify for pooling-of-interests accounting. Arthur Andersen also opined that the merger should qualify for pooling of interest accounting. The SEC did not rule that the merger would not qualify for pooling-of-interests accounting. Therefore, there were no false statements or misrepresentations.
The Farragut Shareholders’ motion for partial summary judgement for negligent misrepresentation is denied. KPMG’s motion for summary judgement is allowed.
B.Negligence Claim against KPMG
The Farragut Shareholders claim KPMG was negligent in issuing its pooling opinion.
A claim for negligence requires that the defendant owe the plaintiff a legal duly, and a breach of that duty proximately caused the plaintiff injury. See O’Gorman v. Antonio Rubinaccio & Sons, 408 Mass. 758, 760 (1990). Whether such a duty exists is a question of law. Wallace v. Wilson, 411 Mass. 8, 12 (1991). Here, as a matter of law, KPMG did not owe Farragut a legal duty.
KPMG was hired by Kislak to represent Kislak in the proposed merger. Any duty KPMG owed was that to Kislak and not Farragut or its shareholders. The record shows that any dealings KPMG may have had with Farragut was at arm’s length. Although the deal was dependent on KPMG issuing an opinion that the merger was poolable, that opinion was to be given to Kislak — KPMG owed no duty to Farragut to issue an opinion. This court will not imply a duty when to do so would place the party in a position of conflict. See Spinner v. Nutt, 417 Mass. 549, 553-54 (1994). Therefore, KPMG did not owe a legal duty to Farragut and, therefore, was not negligent as a matter of law.
The Farragut Shareholders’ motion for summary judgment against KPMG for negligence is denied. KPMG’s motion for summary judgment in opposition to the Shareholders’ claim of negligence is allowed.
C.Farragut Shareholders’ Chapter 93A Claim against KPMG
The Farragut Shareholders’ claim against KPMG for violation of Chapter 93A is denied as a matter of law. The Shareholders do not have a viable claim against KPMG for negligence or negligent misrepresentation. Although, a 93A claim can be brought as a separate cause of action, KPMG did not engage in any acts against Farragut or its shareholders that were unfair or deceptive — KPMG did not owe the Farragut Shareholders any duty. Therefore, the Fanragut Shareholders cannot maintain a claim against KPMG for violation of Chapter 93A.
KPMG’s motion for summary judgment in opposition to the Shareholders Chapter 93A claim is allowed.
D.The Farragut Shareholders’ Claim against KPMG Are Derivative of the Farragut Corporation
“The general principles of corporate law provide that a shareholder may not sue either the corporation or some other wrongdoer if the only injury alleged is a diminution of corporation’s net worth. In such circumstances the corporation is the injured parly, and it alone may sue the wrongdoer for the damage caused.” Hurley v. Federal Deposit Ins. Corp., 719 F.Supp. 27, 30 (D.Mass. 1989). See also 12B W. Fletcher, Cyclopedia of the Law Private Corporations, §5907 et seq. (“Fletcher”); Municipal Light Co. of Ashburnham v. Commonwealth, 34 Mass.App.Ct. 162, 170-71 (1993) (stockholders may not in their own names bring an action for damage to the corporation in which they hold stock; they may bring a derivative action in the name of the corporation). “Corporate mismanagement, or even fraud perpetrated on the corporation, resulting in lower stock prices cannot form the basis for an individual shareholder lawsuit against the wrongdoer or against the corporation.” Hurley, supra at 30.
Only where the shareholders themselves have been defrauded, may they sue the wrongdoer. See 12B Fletcher, §5923.2 (“[d]efrauded purchasers or sellers of stock may maintain an action either individually or as a class action unless the corporation was the purchaser or seller”). That is true even if all the shareholders are victims of the fraud. Id. “If the wrong is primarily against the corporation, the redress for it *295 must be sought by the corporation, . . . and a shareholder cannot sue as an individual.” Id. at §5911.
In determining the nature of the wrong alleged, the court must look to the body of the complaint, not to the plaintiffs designation or stated intention. Id. The action is derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual shareholders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets. Id. “If a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor.” Blasberg v. Oxbow Power Corp., 934 F.Supp. 21, 26 (D.Mass. 1996).
In contrast, “if a plaintiff alleges that she, as an individual investor, was misled or defrauded in the purchase of her investment, this kind of claim is a "direct" one ... (t]hat many investors might have been misled, as the plaintiff was, or that the plaintiff might only be minimally injured, does not convert the claim to a derivative one." Id. See also Barger v. McCoy Hillard Parks, 488 S.E.2d 215, 219 (N.C. 1997) (a shareholder may maintain an individual action against a third parly for an injury that directly affects the shareholder, even if the corporation also has a cause of action arising form the same wrong, if the shareholder can show that the wrongdoer owed him a special duty or that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself).
The essence of the Farragut Shareholders’ complaint against KPMG is that KPMG negligently represented that the proposed merger should qualify for pooling-of-interests accounting, and that the Farragut Shareholders relied on that representation and entered into the merger agreement on July 2, 1993. As a result, the Shareholders’ stock was tied up in a lock-up agreement and when market conditions caused Farragut shares to drop in value, the Shareholders were allegedly injured when they could not sell their shares.
The only injuries the Shareholders allege is the diminution or destruction of the value of their shares of Farragut stock as a result of KPMG’s alleged negligent misrepresentations of Kislak’s poolability in the merger. This is an injury suffered by the corporation itself. See Barger, supra, 488 S.E.2d at 220.
The Shareholders entered into the merger agreement on behalf of Farragut, so that the merger transaction could be consummated. The Shareholders contend that they were individually and directly harmed by KPMG’s actions, but the record does not support that contention. The facts from the record indicate that some of the Shareholders did not know that KPMG represented Kislak. The record also fails to support the individual shareholders’ contention that they were individually misled or defrauded by KPMG. The individual investors do not have a distinct and separate claim from that of the Farragut corporate entity.
The Shareholders’ claims against KPMG, as a matter of law, are a derivative claim of Farragut, and not a “direct” one for individual injuries. Since, Farragut’s claims against Kislak and KPMG were released by the Termination Agreement, the Shareholders’ claims against KPMG are likewise released by the Termination Agreement. KPMG’s motion for summary judgment for reason that the Shareholders lack standing is allowed.
IV. KPMG’s Motion for Summary Judgment against Arthur Andersen
KPMG moves for summary judgment against Arthur Andersen’s claim that (i) KPMG made negligent misrepresentations to Arthur Andersen that Kislak should qualify for pooling-of-interests accounting; (ii) KPMG must indemnify Arthur Andersen for any damages it might pay to its client Farragut and the Farragut Shareholders; and (iii) KPMG is liable to Arthur Andersen for contribution for any damages Arthur Andersen might pay to Farragut and the Shareholders.
A. Negligent Misrepresentation
Arthur Andersen argues that KPMG made negligent misrepresentations to Arthur Andersen when KPMG represented that Kislak qualified for pooling-of-interests accounting. As discussed supra in section III-A, KPMG’s representation is an unactionable opinion. KPMG’s representation was an opinion as to its belief, and in its professional judgement, whether the SEC would conclude that merger transaction should qualify for pooling-of-interests accounting. This representation is not an actionable statement of fact or opinion, but it is rather an opinion — a prediction — as to how the SEC might rule on some future date.
KPMG’s motion for summary judgment on Arthur Andersen’s claim of negligent misrepresentation is allowed, and Arthur Andersen’s opposition is denied.
B. Arthur Andersen’s Claim for Indemnification
KPMG argues that as a matter of law it is entitled to summary judgment on Arthur Andersen’s claim for indemnification. Arthur Andersen proceeds under two theories: (i) it is entitled to indemnification under a tort based theory; and (ii) it is entitled to indemnification under an implied in contract theory.
Three different sets of circumstances may give rise to a right to indemnification. First, an express agreement may create a right to indemnification.[15] See Araujo v. Woods Hole, Martha’s Vineyard, Nantucket S.S. Auth., 693 F.2d 1, 2-3 (1st Cir. 1982). See also W. Prosser, Law of Torts §51 (4th ed. 1971). Second, a contractual right to indemnification may be implied from the nature of the relationship between the par *296 ties. See Decker v. The Black & Decker Manufacturing Co., 389 Mass. 35, 38-39 (1983). Third, a tort-based right to indemnification may be found where there is a great disparity in the fault of the parties. W. Prosser, Law of Torts §51 (1971). Indemnity is permitted only when the would-be indemnitee does not join in the negligent act. See Decker v. The Black & Decker Manufacturing Co., 389 Mass. 35, 40 (1983), and cases cited. “The right to indemnity is limited to those cases in which the would-be indemnitee is held derivatively or vicariously liable for the wrongful act of another.” Id., citing Stewart v. Roy Bros., 358, Mass. 446, 459 (1970). The court has inferred the existence of indemnity agreements only when the terms of the contract themselves contemplated such indemnification. Larkin v. Ralph O. Porter, Inc., 405 Mass. 179, 184 (1989). See e.g., Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153, 158 (1983) (where town agreed to furnish necessary police for crowd control, it was responsible to indemnify for damages arising from its failure to do so); Great Atlantic & Pacific Tea Co. v. Yanofsky, 380 Mass. 326, 331-32 (1980) (where a lessor agreed to make all outside repairs, such an express agreement should be construed to require the lessor to indemnify for damages arising from the failure to make repairs).
The tort-based theory of indemnification is designed to shift the whole loss upon the more guilty of the two tortfeasors. Araujo, supra at 3, citing Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 718 (2d Cir. 1978). Generally, it has been available only when the party seeking indemnification was merely passively negligent while the would be indemnitor was at fault. Araujo, supra, citing Loose v. Offshore Navigation Inc., 670 F.2d 493, 499 (5th Cir. 1982). Tort-based indemnification is inappropriate where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiffs injury. See Araujo, supra, citing Wedlock v. Gulf Mississippi Marine Corp., 554 F.2d 240, 243 (5th Cir. 1977).
In this action, KPMG, as a matter of law, is not liable for any alleged negligent misrepresentations or negligent acts. KPMG’s representations regarding Kislak’s pooling of attributes eligibility are unactionable opinions. Furthermore, as a matter of law, KPMG did not owe a legal duly to the Shareholders. Therefore, KPMG cannot be found more guilty than Arthur Andersen for any potential harm or injury that may found against Arthur Andersen and in favor of Farragut and the Shareholders.
In addition, a contractual right to indemnification will only be implied when there are unique “special factors” surrounding the contractual relationship which indicate an intention by one party to indemnify another in a particular situation. Fall River Housing Auth. v. H.V. Collins Co., 414 Mass. 10, 14 (1992) (citing as persuasive Araujo, supra at 2-3). Farragut does not allege that any special factors exist. Furthermore, the record does not show that KPMG intended to indemnify Arthur Andersen for harm that may result to its client Farragut. Moreover, the relationships between KPMG and Arthur Andersen were at arms’ length. KPMG did not contract with Arthur Andersen, nor did KPMG owe a legal duty to the Farragut Shareholders.
The record fails to support Arthur Andersen’s claim that KPMG must indemnify Arthur Andersen for any damages that Farragut may be entitled to from Arthur Andersen. KPMG’s motion for summary judgement on Arthur Andersen’s claim of indemnification is allowed.
C. Arthur Andersen’s Claim for Contribution
KPMG moves for summary judgment on Arthur Andersen’s claim for contribution. KPMG argues that since it is not liable to Farragut — Farragut’s claim against KPMG has been dismissed — nor the Farragut Shareholders, Arthur Andersen cannot seek a claim of contribution from KPMG.
A claim for contribution is available “where two or more persons become jointly liable in tort for the same injury to person or property.” G.L.c. 231B, §1. The right of contribution is derived from the plaintiffs primary cause of action and is not recoverable from a third party against whom the plaintiff has no cause of action." Berube v. City of Northampton, 413 Mass. 635, 639 (1992).
There is no joint liability here. KPMG did not owe a legal duty to Farragut; therefore, Arthur Andersen cannot seek contribution from KPMG for any damages that may be assessed against Arthur Andersen and in favor of Farragut and its Shareholders.
KPMG’s motion for summary judgment on Arthur Andersen’s claim for contribution is allowed.
ORDER
For the foregoing reasons, it is hereby ORDERED that (i) plaintiff Farragut’s motion for partial summary judgment against defendant Arthur Andersen is DENIED; (ii) defendant Arthur Andersen’s motion for summary judgment is DENIED in part, and ALLOWED in part; (iii) plaintiff Farragut Shareholders’ motion for partial summary judgment against third-party defendant KPMG is DENIED; (iv) third-party defendant KPMG’s motion for summary judgment against the Farragut Shareholders is ALLOWED; and (v) third-party defendant KPMG’s motion for summary judgment against third-party plaintiff Arthur Andersen is ALLOWED.

 The Kislak Shares Agreement reveals that Jay Kislak owned 3,683 shares of Kislak stock. The Shares Agreement *297 did not disclose what percentage of the outstanding shares was owned by Jay Kislak.

 As of June 30, 1993, Farragut’s mortgage servicing portfolio was valued at $ 11.7 million, and Farragut common stock was traded at 61/8 per share on July 2, 1993.

 The S-4 Registration Statement states in part:
Certain of Kislak’s existing shareholders are also shareholders of Kislak National Bank (“KNB”), a commercial bank with assets of approximately $400 million. KNB provides Kislak with a warehouse facility, in addition to being a depository institution for a portion of the servicing related trust funds controlled by Kislak and cash operating accounts. Kislak provides KNB with various administrative and other services related to mortgage loans pursuant to a sub-servicing contract, as well as certain management training, consulting and other services not related to mortgage loans. The post-Merger entity expects to continue to provide such services to KNB following the Merger, for which it will receive a compensation at competitive rates. While the post-Merger entity expects to be able to maintain existing financing arrangements with KNB, or to obtain replacement financing (as to which there are no restrictions) as its lending arrangements with KNB mature or are terminated for any other reason, there can be no assurance that such financing will be available on favorable terms.
The ability of Kislak’s existing shareholders to significantly influence the affairs of the post-Merger entity, as well as the degree to which existing shareholders of Kislak have a controlling interest in KNB may give rise to conflicts of interests.

 The undisputed facts from the record indicate that:
(i) Kislak serves as program administrator and/or master of servicing and Kislak receives revenues from KNB for loan production and processing in the amount of $7.3 million:
(ii) Kislak maintains deposits with KNB of $122 million;
(iii) Kislak provides sub-servicing of mortgage loans for KNB for a total of $2.6 billion;
(iv) Kislak receives loan production revenues from KNB of $4.3 million;
(v) Kislak maintained deposits at KNB aggregating $154.2 million;
(vi) nine officers/directors of Kislak and its subsidiaries are officers or directors of KNB;
(vii) the combined statements for Kislak and KNB are presented to Kislak’s Board of Directors on a quarterly basis;
(viii) Kislak’s compensation committee reviews KNB’s performance and makes recommendations for Jay Kislak’s bonus at KNB; and
(ix) Kislak and KNB also share common facilities, with their headquarters located in the same place.

 In its December 15, 1993 memorandum, Arthur Andersen wrote:
Based on the facts supplied to us by KPMG . . . the issue of whether Kislak Mortgage is autonomous and, accordingly, eligible to be merged with Farragut in a transaction qualifying for use of the pooling-of-interests method of accounting is a matter of judgment. However, given the uncertainty of the eligibility of the pooling-of-interests method in this situation, we would recommend proceeding with the proposed Farragut/Kislak transaction only after pre-clearing with the SEC their opinion on whether Kislak meets the autonomy criteria set forth in APB No. 16.

 The December 17, 1993 Termination Agreement states in part:
Except for the representations, warranties, agreements and covenants set forth in this Agreement, Farragut does hereby remit, release, acquit, satisfy and discharge Kislak, .. . and any other person or entity who together with such released parties may be jointly liable therewith to Farragut, of and from all actions, causes, suits, . . . claims and demands whatsoever, in law or in equity, which Farragut . . . ever had . . . against Kislak . . . and any other person or entity who together with such released parties may be jointly liable therewith to Farragut. . .

 George Begley is identified as an individual plaintiff as he is a shareholder of Farragut.

 The Restatement (Second) of Torts §552, states in part:
(1) One who, in the course in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
Comment a: “Honesty requires only that the maker of a representation speak in good faith and without consciousness of a lack of any basis for belief in the truth or accuracy of what he says. The standard of honesty is unequivocal and ascertainable without regard to the character of the transaction in which the information will ultimately be relied upon or the situation of the party relying upon it.”
Comment b: ‘This Section applies not only to information given as to the existence of facts but also to an opinion given upon facts equally well known to both the supplier and the recipient.”
Comment e: “When the information concerns a fact not known to the recipient, he is entitled to expect that the supplier will exercise that care and competence in its ascertainment which the supplier’s business or profession requires and which, therefore, the supplier professes to have by engaging in it. . . . When the information consists of an opinion upon facts supplied by the recipient or otherwise known to him, the recipient is entitled to expect a careful consideration of the facts and competence in arriving at an intelligent judgment.”
Comment f: “If the matter is one that requires investigation, the supplier of the information must exercise reasonable care and competence to ascertain the facts on which his statement is based. He must exercise the competence reasonably expected of one in his business or professional position in drawing inferences from facts not stated in the information.”
Comment j: “Under this Section, the liability of the maker of a negligent misrepresentation is limited to the transaction that he intends, or knows that the recipient intends, to influence, or to substantially similar transaction.”

 Restatement (Second) of Torts §539, Representation of Opinion Implying Justifying Facts, states in part:
(1) A statement of opinion as to facts not disclosed and not otherwise known to the recipient may, if it is reasonable to do so, be interpreted by him as an implied statement (a) that the facts known to the maker are not incompatible with his opinion; or (b) that he knows facts sufficient to justify him in forming it.
(2) In determining whether a statement of opinion may reasonably be so interpreted, the recipient’s belief as to whether the maker has an adverse interest is important.

 Restatement (Second) of Torts §538A states in part:
A representation is one of opinion if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgement.
*298 Comment b. Fact and opinion. A representation of fact is a positive assertion that the fact is true. It implies that the maker has definite knowledge or information which justifies the positive assertion. A representation of opinion, on the other hand, is only one of the maker’s belief as to the fact. It implies that he does not have definite knowledge, that he is not sufficiently certain of what he says to make a the positive statement, or at most, . . . that he knows of no facts incompatible with the belief, or that he does know some facts that justify him in forming it.

 On July 21, 1997, this court (J. Welch) dismissed Farragut’s claims against KPMG based upon the Termination Agreement of December 17, 1993. The claims that remain are those of the individual Farragut Shareholders.

 Arthur Andersen does not have an express indemnification right.