Hinkle, J.
Plaintiffs, Marilyn Gianocostas (“decedent’s mother”) and George Gianocostas (“decedent’s father”), administrators of the estate of their daughter, Jennifer Gianocostas, seek damages for negligence, negligent misrepresentation and the wrongful death of their daughter. Defendants Riu Hotels, SA., Riusa II, S.A., Delta Holidays, Ltd., Visantilla, A.I.E., and Macao Caribe Beach, S.A. (collectively “foreign defendants” or “Riu Hotels”) have moved to dismiss the complaint for lack of personal jurisdiction under Mass.R.Civ.P. 12(b)(2) and Jorum non conveniens. Defendant GWV International, a division of INTERFACE GROUP -Massachusetts, Inc. (“GWV”), has separately moved to dismiss for Jorum non conveniens and lack of a contractual or common law duty. All defendants argue that the Dominican Republic is an adequate alternative forum and that private and public interests weigh in favor of dismissal. After a hearing, and for the reasons set forth below, defendants’ motions to dismiss for Jorum non conveniens are ALLOWED.[3]
BACKGROUND
The following facts are taken from the amended complaint, the depositions, the affidavits accompanying the foreign defendants’ and GWV’s motions to dismiss and plaintiffs opposition. Facts in dispute are noted.
Jennifer Gianocostas (“Jennifer” or the “decedent”), the plaintiffs’ only child, was a well-controlled, insulin-dependent diabetic at the time she began considering a vacation with friends for her 1999 college spring break. In February 1999, Jennifer and a friend visited the American Automobile Association of Southern New England (“AAA”) in Saugus, Massachusetts. There, Jennifer and her friend discussed possible vacation destinations with an AAA travel agent, Anthony Mavrakos. According to the record, Jennifer spoke with Mavrakos on several different occasions regarding her vacation plans.[4]
After examining brochures in the AAA office and having discussions with Mavrakos, Jennifer and her friends, Jacquelyn Dondero and Cheryl Darrigo, ultimately selected a GWV vacation package to Puerta Plata in the Dominican Republic. GWV, a Massachusetts based tour operator, sold package tours that consisted of air transportation, hotel accommodations and ground transfers.[5] Jennifer’s vacation package consisted of seven nights at the Hotel Riu Mambo in Puerto Plata from March 13, 1999 through March 20, 1999.
The Hotel Riu Mambo in Puerto Plata is part of a chain of Riu Hotels that bear the “Riu” trade name. Riusa II, S.A., the marketing and promotional arm of the foreign defendants, began a relationship with GWV in June of 1998. The goal of the relationship was to sell vacation packages promoting hotel accommodations in various Riu Hotel destinations. Through this relationship, GWV paid to reserve blocks of rooms in several Riu Hotels, including the Hotel Riu Mambo, where the decedent and her friends stayed. The foreign defendants created a full-color advertisement with a description of the hotel to be placed in GWV’s Sunsations Catalogue. GWV distributed this catalogue to approximately 3,000 travel agencies, 2,000 of which were located in Massachusetts. The foreign defendants also produced their own Riu Hotels brochure. This brochure described the hotel accommodations more extensively than GWV’s Sunsations Catalogue and included a reference to medical services provided at each hotel. Upon request, the foreign defendants occasionally sent Riu brochures directly to travel agents who called the foreign defendants to request a copy of the brochure. More often, however, Riu brochures were handed out at tour operator trade shows to travel agents who wanted to gain increased exposure to a variety of destinations. There is no evidence in the record that Mavrakos had any Riu brochures; however, he did have GWV’s Sunsations Catalogue, which he re-ordered periodically from GWV.
Jennifer and her friends arrived at the Hotel Riu Mambo in Puerto Plata on March 13, 1999. Janet Harris, a GWV destination representative, provided them with an orientation to Puerta Plata and told them she was available to assist them if necessary. Harris had worked for GWV as a destination representative in the Dominican Republic for the preceding five years. Her job responsibilities included meeting tour participants at the airport upon their arrival, accompanying them to their buses for transfer to the hotels, conducting weekly orientation meetings, generally assisting tour participants, making herself available to answer questions by telephone and during certain hours at many of the hotels, assisting tour participants at the airport during their departure and acting as a liaison with service providers.
On Monday, March 15, 1999, Jennifer became ill, vomiting periodically throughout the night. Her friend Jacquelyn Dondero contacted the front desk of the hotel, and a hotel representative put her in touch with the Doctor Correa International Touristic Medical Service & CIA (“Doctor Correa Clinic”), which had a contractual relationship with the Hotel Riu Mambo to provide medical services to its guests. Dondero described Jennifer’s condition to the doctor and informed him that she was a diabetic. The doctor did not appear to understand the words “diabetic” or “diabetes.” The doctor told Dondero that Jennifer would be fine and that the pharmacy would re-open in the morning. Dondero was unable to reach Harris that night.
The following day Jennifer continued to feel ill and contacted Harris. Harris recommended that she stay hydrated. According to Harris, she did not know at this point that Jennifer suffered from diabetes. (Harris Aff., ¶3.) On the morning of Wednesday, March 17, 1999, Jennifer, still feeling ill, went to the Doctor Correa *446 Clinic where she stayed overnight. The doctor assured Jennifer’s friends that she would be all right. According to her affidavit, the decedent’s mother spoke with Harris that day, explained that Jennifer was a diabetic and expressed concern that the clinic doctor did not appear to understand the words “diabetic” or “diabetes.” The decedent’s mother told Harris she was concerned about her daughter and would bring her home if she could not receive proper medical care in the Dominican Republic. Harris told the decedent’s mother that Jennifer’s condition was improving. (Decedent’s mother’s Aff., ¶8.) The decedent’s father also spoke with Harris several times that day. According to the decedent’s father’s affidavit, Harris assured him that Jennifer had a common stomach ailment and that she was in good hands at the Doctor Correa Clinic. (Decedent’s father’s Aff. ¶6.) According to Harris’ affidavit, the decedent’s father called her on her cell phone while she was visiting Jennifer at the clinic: The decedent’s father did not ask to speak to the doctor attending Jennifer, who spoke English. (Harris Aff. ¶4.)
Jennifer was discharged from the Doctor Correa Clinic on Thursday, March 18, 1999, but her vomiting and weakness persisted throughout the day. Dondero telephoned the Doctor Correa Clinic and spoke with the physician on duty. That doctor informed Dondero that he had consulted with the clinic doctor who previously treated Jennifer, and they had agreed that her condition was caused by nervousness. The doctor told Dondero to call him again if the vomiting continued. Later that evening, Jennifer telephoned the Doctor Correa Clinic doctor and requested that he come to see her. When the doctor arrived, he examined Jennifer and diagnosed her as having gastroenteritis. At approximately eleven o’clock that evening, the doctor brought Jennifer back to the Doctor Correa Clinic.
In the early morning on Friday, March 19, 1999, the doctor telephoned Jennifer’s friends and requested that they bring her glucose tester to the Doctor Correa Clinic. When the friends arrived, Jennifer was hallucinating and unable to operate her glucose tester. The doctor, also unable to operate the glucose tester, had a second one delivered to the Doctor Correa Clinic, which he again was unable to operate. Upon observing' Jennifer’s eyes rolling back into her head, Dondero insisted that she be admitted to the hospital. The doctor agreed, and Jennifer was transported via ambulance to the Grupo Medico Dr. Bournigal, S.A. (the Bournigal Hospital) in Puerto Plata. Harris had no role in that decision.
Sometime sifter Jennifer was admitted to Bournigal Hospital, the plaintiffs made telephone contact with Harris: Harris was then unaware that Jennifer had been transferred from the Doctor Correa Clinic to the hospital. Harris subsequently visited Jennifer at the hospital on Friday and Saturday. The decedent’s mother informed Harris that she intended to fly down to the Dominican Republic immediately. Harris told her that this was unnecessary since the medical care at Bournigal Hospital was fine. Nevertheless, the decedent’s mother left Boston that day for the Dominican Republic, and the decedent’s father and his present wife began arranging for Jennifer’s emergency transportation to Miami. When the decedent’s mother arrived at Bournigal Hospital on the evening of March 19, 1999, Jennifer appeared very weak. The following day, Jennifer was transported to a hospital in Miami where she died one month later.
The decedent’s mother arrived in the Dominican Republic around 8 p.m. on Friday, March 19. Harris picked her up at the airport and took her to the Bournigal Hospital to see her daughter. The decedent’s mother’s perception was that the hospital was filthy and the medical equipment “very old.” Trash cans overflowed with garbage in the intensive care unit. Hospital personnel were unresponsive to the decedent’s mother’s inquiries. (Decedent’s Mother’s Aff. at ¶ 10.) Jennifer’s doctors spoke sufficient English that decedent’s mother could communicate with them. (Harris Aff. at ¶ 12.)
DISCUSSION
. Under G.L.c. 223A, §5, an action maybe dismissed upon finding “that in the interest of substantial justice the action should be heard in another forum.” Massachusetts courts have incorporated the standards and principles of the federal common law doctrine into the stateforum non conveniens analysis. New Amsterdam Casualty Co. v. Estes, 353 Mass. 90, 95 (1967); Green v. Manhattanville College, 40 Mass.App.Ct. 76, 78, cert. denied, 422 Mass. 1107 (1996).
The forum non conveniens inquiry involves two steps: whether an adequate alternative forum is available, and whether private and public interests strongly favor litigating the claim in the other forum. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1946).
1. The Adequate Alternative Forum Issue
An adequate alternative forum is usually found when the defendant is “amenable to process” in another jurisdiction. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 n.22 (1981); Gulf Oil Corp. v. Gilbert, 330 U.S. at 506-07. In rare circumstances where the remedy offered by the other forum is clearly unsatisfactory in that it effectively provides no remedy at all, the other forum maybe inadequate. Piper Aircraft Co. v. Reyno, 454 U.S. at 255 n.22.
Plaintiffs contend that the Dominican Republic is not an adequate alternative forum because the Dominican Civil Code (“the Code”) and case law do not recognize plaintiffs’ claims. In support of this contention, plaintiffs rely on an affidavit from Marcos Pena Rodriguez, an attorney who practices law in the Dominican Republic in a branch office of a large Florida law firm. (Rodriguez Aff., ¶ 1.) Rodriguez states that Articles 1382 through 1384 of the Code do not specif *447 ically cover medical malpractice claims or claims of negligent misrepresentation. He also claims there is a lack of precedent in Dominican Republic case law regarding recovery against a physician. (Rodriguez Aff, ¶6.)
Conversely, affidavits submitted by the defendants from Juan Carlos De Moya Chico (“Chico”) and Práxedes J. Castillo Baez (“Baez”), both attorneys in the Dominican Republic, state that the Dominican Republic recognizes and permits litigation of the subject matter in dispute. Both Chico and Baez state that Articles 1382 through 1384 of the Code provide the foundation for actions for damages to redress tortious conduct. (Baez Aff., ¶6; Chico Aff., ¶4.) According to Chico, the Code provisions incorporate both intentional and negligent torts and extend to master/servant and agency relationships. (Chico Aff., ¶4.) In direct contrast to Rodriguez’s affidavit, defendants’ affiants state that these Code provisions also apply to medical malpractice cases. (Baez Aff, IPs 3, 6; Chico Aff, ¶4.)[6] Baez states that the trial court in medical malpractice cases has authority to appoint experts and sometimes does so. According to Baez, the local media reported a recent medical malpractice case in the Dominican Republic where a non-resident brought a wrongful death claim against a Dominican physician. (Baez Aff., ¶3.) In addition, Baez states that the Criminal Chamber of the Court of Appeals of Santo Domingo recently ruled against a local hospital in connection with the death of a patient involving negligence.
Plaintiffs also argue that the Dominican Republic’s more limited discovery procedures and lack of jury trials render it an inadequate forum. Rodriguez states that pre-trial discovery in the Dominican Republic does not allow for deposition testimony and is strictly limited to exchange of documents. (Rodriguez Aff., ¶6(^.) According to Rodriguez, damages for wrongful death actions in the Dominican Republic may be smaller than those awarded in the United States. (Rodriguez Aff. 16(m), (n).) Rodriguez also notes that establishing an agency relationship within the Dominican legal system is extremely difficult. Uncovering information about the relationships of various business entities would be burdensome to plaintiffs, he claims, because there is no central filing system in place in the Dominican Republic. (Rodriguez Aff. ¶6(j), 8.)
Generally, in Jorum non conveniens analysis, the fact that the proceedings and remedies available in a foreign jurisdiction differ from those in the Commonwealth or are not as favorable to the plaintiff does not render the alternative system inadequate. See Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 159 (2nd Cir. 1980) (possibility that damages recovered in alternative forum may be substantially less than in forum state does not make alternative forum inadequate); LTX Corp. v. Daewoo Corp., 979 F.Sup. 51, 59 n.7 (D.Mass. 1997) (different or less generous discovery rights do not make foreign court system inadequate).
In their affidavits, Chico and Baez explain that the Dominican legal system is derived from the French. (Baez Aff., ¶4; Chico Aff.,- ¶3.) Dominican judges play an active, investigatory role in their cases by asking questions of witnesses and appointing experts that might be helpful in deciding the case. (Baez Aff, ¶4.) Attorneys for both parties are allowed to submit questions to the judges, which they ask unless the questions are deemed to be repetitive, irrelevant or unnecessary. (Baez Aff, ¶4.) Both Baez and Chico state that the presentation of evidence in the Dominican Republic occurs through live testimony in response to questions asked by the judge, introduction of documents, personal statements of the parties and by expert testimony and reports. (Baez Aff, ¶4; Chico Aff, ¶7.) Damages are awarded based on the evidence before the court, and both moral and material damages are recoverable. (Chico Aff., ¶6.) In this case, “moral” damages could be awarded for grief and suffering for the death of the decedent, and “material” damages for financial expectations and the economic relationship between plaintiffs and decedent. (Chico Aff., ¶6.)
Through the affidavits of Chico and Baez, defendants show that the subject matter of plaintiffs’ claims can be heard by Dominican courts. Rodriguez states that the requirement that every non-Dominican litigant post a “judicatum solvi bond” when filing a lawsuit in the Dominican Republic would be unduly burdensome to the plaintiffs. (Rodriguez Aff, 16(a)-(d).) Rodriguez also states that the statute of limitations could bar the plaintiffs from filing any claims in the Dominican courts. (Rodriguez Aff., 16(h).) These arguments are unpersuasive, however, because defendants have filed notice of waivers with this Court, agreeing to waive any defenses based on the statute of limitations, and they agree to pay or waive any bond requirements. Baez, in his affidavit, states that the requirement that non-residents post a bond may be waived by the defendant and that courts do not intervene in that decision. (Baez Aff. 118.)
Thus, on the record before me, defendants have shown that plaintiffs have an appropriate remedy available if their claims are litigated in the Dominican Republic, that Dominican courts hear this type of dispute, and that defendants are amenable to process there. Piper Aircraft Co. v. Regno, 454 U.S. at 254 n.22.
Supporting my position on this issue is the fact that judges in other jurisdictions have ruled in negligence actions that the Dominican Republic is an adequate alternative forum. Calvo v. Sol Melia, S.A., 761 So.2d 461, 464 (Fla.Ct.App. 2000) (Dominican Republic an adequate alternative forum for personal injury action brought by non-resident vacationer); Pascual Ortega Dominguez v. Pyrgia Shipping Corp., U.S. Dist. LEXIS *448 9799 (1999) (Dominican forum will not treat injured plaintiff unfairly or deny him appropriate remedies).[7]
2. The Private and Public Interest Issue
I am mindful that plaintiff s choice of forum should rarely be disturbed unless the balance of both private and public concerns strongly favors the moving party. Green v. Manhattanville College, 40 Mass.App.Ct. at 79. I also recognize that defendants bear the burden of “showing circumstances so strongly in [their] favor that plaintiffs should be denied the right to bring suit in Massachusetts.” Minnis v Peebles, 24 Mass.App.Ct. 467, 473 (1987).
Appropriate private interests to weigh include relative ease of access to sources of proof, availability of compulsory process to obtain testimony of unwilling witnesses, the cost of obtaining attendance of willing witnesses and practical factors that would make the trial easy, expeditious and inexpensive. W.R. Grace & Co. v. Hartford Accident & Indem. Co., 407 Mass. 572, 578 (1990).
Defendants argue that evaluation of these factors shows that the Dominican Republic is the only adequate forum for the entire litigation. Specifically, defendants contend:
This case, at is core, is a medical malpractice action. Regardless of the various theories of liability asserted against GWV and the foreign hotel defendants, the plaintiffs must prove that the decedent, Jennifer Gianocostas, received negligent medical care and treatment while in the hands of the employees of the Dr. Correa Clinic and/or the Bournegal [sic] Hospital and that this negligent medical care and treatment led [sic] to her death.
GWV’s Opposition Brief at p. 4.
As defendants argue, there is no question that potential third-party defendants (i.e., the physicians who treated the decedent, the Doctor Correa Clinic and Bournigal Hospital) may be liable for all or part of plaintiffs’ injury and damages. There is also no question that this court lacks jurisdiction over these potential parties. The Doctor Correrá Clinic and the Bournigal Hospital are Dominican entities staffed by Dominican residents. They have no offices or employees in the United States. Absent the ability to implead these parties, defendants are severely disadvantaged because they cannot adequately prepare their defense. See DeMelo v. Ledule Labs., 801 F.2d 1058, 1063 (1st Cir. 1986) (defendant’s inability to implead potential third-party defendants strongly favored dismissal so that all claims could be litigated together in Brazil).
In addition to these potential third-party defendants, all witnesses except Harris and the decedent’s two college friends who were with the decedent throughout her week at the Doctor Correa Clinic and Bournigal Hospital are located in the Dominican Republic. Essential records are also in the Dominican Republic, largely in the control of the medical personnel who cared for the decedent during the period she was ill in the Dominican Republic. For defendants to have adequate access to sources of proof requires the testimony of relevant Dominican witnesses and the obtaining of documents in the Dominican Republic.
Defendants submit an affidavit from a former judge of the Santo Domingo Court of Appeals, Rafael Tulio Perez de Leon. This affidavit states that there is no treaty or other agreement in force between the United States and the Dominican Republic which establishes a procedure whereby a Dominican court or other governmental body can compel a witness in the Dominican Republic to give sworn testimony for use in a United States action. Id. at ¶2.
Thus, as to every theory of liability plaintiffs allege, the defendants lack access to critical proof. They cannot join critical parties; they cannot compel critical testimony; and they cannot obtain critical documents. This situation creates the strong circumstances in defendants’ favor to deny plaintiffs the right to this forum.
This conclusion is buttressed by a balancing of the public interests involved. In evaluating public interest, the court considers such factors as the administrative burdens caused by litigation which originated elsewhere and by the desirability of trial in a forum at home with the governing law. W.R. Grace & Co. v. Hartford Accident & Indem. Co., 407 Mass. at 578; Mercier v. Sheraton Int’l, Inc., 935 F.2d at 424.
Plaintiffs’ claims are grounded in events which they concede occurred within the Dominican Republic. Ordinarily, in Massachusetts the substantive law governing a tort action is that of the place where the injury occurred. Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 333 (1983).[8] Massachusetts of course has a strong interest in the safety of its citizens who travel to foreign countries. However, as noted, the Dominican Republic is the place of the alleged harm; the hotel, many of the foreign defendants, the physicians who treated the decedent, the Doctor Correa Clinic and the Bournigal Hospital are located there, and Harris’ alleged misrepresentations occurred in that country. Thus, the Dominican Republic has a strong interest in determining who may be held liable, directly and vicariously, for the injury plaintiffs allege in this case and for the safety of tourists who visit its resorts. To the extent the ultimate fault in this case is that of Dominican medical providers or local hoteliers, it is the Dominican Republic, not Massachusetts, with an interest in oversight of those parties.
ORDER
For the foregoing reasons, the defendants’ motions to dismiss under M.G.L.c. 223A, §5 and the doctrine of forum non conveniens are ALLOWED.

 This Court’s dismissal is based solely on Jorum non conveniens. Therefore, I do not address the foreign defendants’ claim of lack of personal jurisdiction or GWV’s claim of lack of contractual or common law duty.

 Plaintiffs claim that the decedent told Mavrokos during these meetings that she was a diabetic and needed specific information about the availability of hotel medical services. Plaintiffs also allege that Mavrakos relied on defendants' extensive informational resources to answer the decedent's specific questions and to allay her concerns about available medical services. Plaintiffs further claim that the decedent chose her trip as a result of Riu Hotels’ and GWV’s representations regarding their medical services.
GWV claims that plaintiffs make a speculative leap that it had access to a Riu brochure containing information about available medical services and used this information to answer any questions Mavrakos had on behalf of the decedent regarding medical services. In his deposition, Mavrakos claims to have no memory of being made aware of the decedent’s diabetes, of making any representations regarding medical services or of contacting any defendant to answer such questions. (Mavrakos Dep. at 68-70, 73.)

 It was the usual practice of Mavrakos to contact the tour operator to check the availability of reservations for a particular date and then to relay those details to his clients. Although Mavrakos did not frequently deal with GWV because it was not considered a preferred vendor by AAA, he was able to provide Jennifer and her friends with pricing and reservation information. Mavrakos ultimately booked their trip. Neither Mavrakos nor AAA is named as a defendant.

 Chico states “Nothing in those provisions limits them to non-medical negligence.” Chico Aff. ¶4.

 Both parties’ affidavits suggest that the Dominican Republic made an effort to reform its legal system in the 1990s to create a more independent and stable judiciary that is not subject to political pressure. See Banco Mercantil, SA. v. Arencibia, 927 F.Sup. 565, 567 (D.Puerto Rico 1996) (court rejected argument that the Dominican Republic is corrupt and incompetent forum). However, as noted in Banco Mercantil, “it is not the business of our courts to assume responsibility for supervising the integrity of the judicial system of another sovereign nation.” 927 F.Sup. at 567-68.

 In resolving conflict of laws issues, Massachusetts courts often rely on the Restatement (Second) of Conflict of Laws and Professor R.A. Leflar’s American Conflicts Law. Bushkin Assocs., Inc. v. Raytheon, Inc., 393 Mass. 622, 623-34 (1985). Under the Restatement, factors relevant to the choice of law are the needs of interstate and international systems, relevant policies of the forum, relevant policies and interests of other interested states, protection of justified expectations, basic policies underlying particular fields of law, certainly, predictability and uniformity of results and ease in the determination and application of law to be applied. Restatement (Second) of Conflict of Laws at §6(2) (1971). Considerations proposed by Professor Leflar are predictability of results, maintenance of interstate and international order, simplification of judicial task, advancement of forum’s governmental interests and application of the better rule of law. R.A. Leflar, American Conflicts Law §95, at 279 (4th ed. 1986).