Smith, Herman J., J.

INTRODUCTION

Plaintiffs, Marilyn Gianocostas (“Marilyn”) and George Gianocostas (“George”) (“the Gianocostases”), administrators of the estate of their daughter, Jennifer Gianocostas (“Jennifer”), have brought this action against Defendants, Riu Hotels, S.A. (“Riu”), RIUSAII, S.A., Delta Holidays, LTD., Visantilla, A.I.E., and Macao Caribe Beach, S.A., and GWV International (“GWV”), a division of Interface Group-Massachusetts, Inc., alleging therein negligence, wrongful death, and negligent misrepresentation. On June 29, 2001, this court allowed the defendants’ motions to dismiss the complaint for forum non conveniens [13 Mass. L. Rptr. 444]. On February 11, 2003, the Court of Appeals of Massachusetts (“the Court of Appeals”) affirmed the dismissal as to all the defendants except GWV and remanded the case to this court for further consideration of the issue of forum non conveniens. In a Memorandum of Decision dated January 27, 2005, this court allowed GWVs motion to dismiss for forum non conveniens as to the Gianocostases’ claim of negligence (Count III) and denied the motion with respect to the negligent misrepresentation claim (Count IV) and the wrongful death claim predicated thereupon (Count V) [19 Mass. L. Rptr. 42]. Therefore, the only claims remaining against GWV are Counts IV and V. Pursuant to Mass.R.Civ.P. 56, this matter is now before this court on GWVs motion for summary judg *277 ment as to Counts IV and V. GWV further requests that this court dismiss Counts IV and V based on its renewed motion to dismiss on grounds of forum non conveniens. For the following reasons, GWVs renewed motion to dismiss for forum non conveniens is DENIED, and GWVs motion for summary judgment on Counts IV and V is ALLOWED.

BACKGROUND

The relevant facts, drawn from the materials accompanying GWVs motion for summary judgment and the Gianocostases’ opposition thereto, are as follows. Jennifer, the only child of the Gianocostases, was a twenty-year-old college student, who attended Salem State College in Massachusetts. Jennifer was diagnosed with Type I diabetes in May 1996. Jennifer required daily insulin injections to control her diabetes. Her condition also required that she regularly monitor her blood sugar levels.
In February and March 1999, Jennifer with friends Jacquelyn Dondero (“Dondero”) and Cheryl Darrigo (“Darrigo”) planned a vacation to the Dominican Republic, using the travel services of the American Automobile Association (“AAA”). Anthony Mavrokas (“Mavrokas”), a Massachusetts travel agent employed by AAA, gave Jennifer information about a vacation package in the Dominican Republic offered by GWV, which included air transportation, hotel accommodations and ground transfers. GWV is a Massachusetts-based tour operator which sells all-inclusive package tours. GWV does not own or operate any of the accommodations or other services offered through its Packages.
Jennifer informed Mavrokas of her medical condition and that she would need access to a refrigerator to store her insulin. Jennifer also questioned Mavrokas about the availability of medical services at the Hotel Riu Mambo (“the Hotel”) in Puerto Plata, Dominican Republic, which GWV advertised as the destination hotel. Mavrokas confirmed to Jennifer that the Hotel did offer medical services and that she would have access to a refrigerator. Based on that information, and in spite of George’s misgivings about the Dominican Republic as a destination, Jennifer and her friends purchased a seven-night vacation package, including accommodations at the Hotel.
On March 13, 1999, Jennifer, Dondero and Darrigo arrived at the Hotel in Puerta Plata. Janet Harris (“Harris”), a GWV destination representative, met Jennifer and her friends at the Hotel and provided them with an orientation to Puerta Plata and the Hotel complex. Harris further told Jennifer and her friends that she was available to assist them if necessary and gave them her telephone number. At that time, Harris had worked for GWV as a destination representative in the Dominican Republic for five years. Her job responsibilities entailed meeting vacationers at the airport, holding hospitality desk hours during certain hours at various hotels in the Dominican Republic, acting as a liaison with service providers, and advising GWVs home office of any serious problems or complications.
On the evening of March 15, 1999, Jennifer began to vomit and to suffer from diarrhea. Dondero called the front desk of the Hotel for assistance. A Hotel representative connected Dondero to the Doctor Correa International Touristic Medical Service and CIA (“the Clinic”), which is located within the Hotel complex and provides medical services to its guests. The Clinic does not offer medical services to residents of the Dominican Republic.
Dondero described Jennifer’s symptoms to a doctor at the Clinic and informed the doctor that Jennifer was diabetic. The doctor did not appear to understand the words “diabetic” or “diabetes.” The doctor suggested to Dondero that Jennifer suffered from an upset stomach. The doctor recommended Dondero purchase Imodium from the Hotel pharmacy to treat Jennifer’s symptoms. Dondero was unable to reach Harris that night.
On the morning of March 16, 1999, after learning of Jennifer’s illness through Dondero’s mother, Marilyn telephoned Jennifer in the Dominican Republic. Jennifer told her that she was feeling better and that Dondero and Darrigo were getting Imodium for her from the Hotel pharmacy. Jennifer also told her mother that she had been testing her blood sugar levels and that her glucose levels were fine. Marilyn then telephoned the office of Jennifer’s éndocrinologist, Timothy Stiyker, M.D. (“Dr. Stryker”). She reached Dr. Stryker’s answering service and communicated Jennifer’s symptoms and circumstances. Thereafter, Dr. Januzzi, an on-call physician from Dr. Stryker’s office, returned her telephone call. Dr. Januzzi stated that he believed that a stomach virus had caused Jennifer’s ailments. Marilyn provided Dr. J anuzzi with J ennifer’s telephone number at the Hotel and requested that he or Dr. Stryker telephone Jennifer. Marilyn also contacted GWV to explain that Jennifer had been ill and that her friends had been unable to reach Harris. A GWV representative told her that she would attempt to contact Harris.
That afternoon, Dondero and Darrigo visited Harris during office hours at a hotel next to the Hotel complex, during which they described Jennifer’s maladies. Harris believed that Jennifer suffered from a common stomach ailment and recommended that Jennifer stay hydrated. At that point, Harris did not know that Jennifer was diabetic.
Marilyn again telephoned Jennifer, who said that she was feeling better and was continuing to test her "blood sugar levels, which evidently were testing within the controlled range. Later that evening, George telephoned Jennifer to discuss her illness. During that conversation, George expressed his concern about Jennifer’s condition and the medical care in the Dominican Republic. George then telephoned Dr. *278 Stryker’s office and left a message, in which he asked that Dr. Stryker call Jennifer. Subsequently, that evening, Dr. Stryker spoke to Jennifer and advised her on how to manage her diabetic condition in light of her symptoms.
On the morning of March 17, 1999, still feeling ill, Jennifer went to the Clinic with Dondero and Darrigo, where she underwent an IV infusion. The doctor at the Clinic explained that Jennifer suffered from dehydration and would need to stay overnight. Marilyn telephoned Harris that day to inform Harris that Jennifer had been admitted to the Clinic and that Jennifer was diabetic. Marilyn also told Harris that she would bring Jennifer home if she could not receive proper medical care in the Dominican Republic. Harris replied that Jennifer’s condition had been improving and that she had never encountered problems with the medical treatment at the Clinic.
George also spoke to Harris several times on March 17. George told Harris that he would fly down to the Dominican Republic if Jennifer was at risk. Harris assured George that Jennifer was only dehydrated and remained in goods hands at the Clinic. Harris further stated that the medical care was excellent and said that she was from Portsmouth, New Hampshire. George understood this statement to mean that he and Harris shared a common notion of what constituted excellent medical care. Harris also said that she would periodically check on Jennifer at the Clinic. Harris visited Jennifer at the Clinic twice that day and observed that Jennifer’s condition seemed improved.
Marilyn spoke to the doctor at the Clinic that afternoon. The doctor, who spoke English, told Marilyn that Jennifer was sleeping and resting comfortably. At some point that day, George received a message from the office of Dr. Stiyker that Dr. Stiyker had contacted Jennifer and that Jennifer’s condition did not appear to be grave.
On the morning of March 18, 1999, Marilyn again telephoned the Clinic, and the doctor informed her that Jennifer was resting. Later that day, Jennifer was discharged from the Clinic. Due to her weakened state, an ambulance transported Jennifer to the Hotel. Jennifer’s vomiting continued throughout the day. That evening, Diane Gianocostas (“Diane”), George’s current wife, telephoned Jennifer. Jennifer told Diane that she felt ill and wanted a doctor.
Dondero called the Clinic and spoke to the doctor on duty, who was a different doctor from the one who had previously treated Jennifer. That doctor told Dondero that he had consulted with the doctor who had treated Jennifer, and they believed that her condition had been aggravated by “nervousness.” The doctor also told Dondero to call him again if Jennifer’s vomiting persisted.
Jennifer telephoned the Clinic and requested that the doctor come to her hotel room. At the hotel room, the doctor examined Jennifer and diagnosed her as having gastroenteritis. Subsequently, the doctor returned Jennifer to the Clinic, arranging for a luggage cart to transport her to the Clinic because Jennifer felt too weak to walk. Dondero then telephoned Marilyn to inform her that Jennifer had been readmitted to the Clinic.
In the early morning on March 19, 1999, the doctor telephoned Dondero and Darrigo to ask that they bring Jennifer’s blood glucose tester to the Clinic. When Dondero and Darrigo arrived at the Clinic, Jennifer appeared to be hallucinating, and she was unable to operate the glucose tester. Neither the doctor at the Clinic nor Dondero or Darrigo could operate the glucose tester for her. Dondero insisted that Jennifer be admitted to a hospital. The doctor then had Jennifer transported by ambulance to the Grupo Medico Dr. Bournigal, SA. (“the Bournigal Hospital”) in Puerto Plata.
That morning, Dondero telephoned Marilyn to inform her that Jennifer had been moved from the Clinic to the Bournigal Hospital. Marilyn relayed this information to George. Shortly thereafter, Marilyn called Harris and informed her that Jennifer had been admitted to the Bournigal Hospital and that she intended to fly down to the Dominican Republic immediately. Harris told Marilyn that it was unnecessary to fly down because the medical care at the Bournigal Hospital was excellent. Harris further stated that she had been treated at the Bournigal Hospital for various ailments and that she had been satisfied with her treatment at the hospital.
At some point that afternoon, Diane spoke with her employer, Ralph Metsen, M.D. (“Dr. Metsen”), a sinus specialist affiliated with Massachusetts General Hospital (“MGH”), and urged him to speak to Jennifer’s doctors at the Bournigal Hospital. Dr. Metsen, with the help of Diane, contacted Dr. Felix Desangles (“Dr. Desangles”) in the Dominican Republic. Diane used the services of an interpreter from MGH to facilitate the conversation between the two doctors. Diane also spoke with Dr. Desangles several times that day.
Marilyn arrived in the Dominican Republic the evening of March 19. Harris picked her up at the airport and took her to the Bournigal Hospital. Upon arriving at the Bournigal Hospital, Harris accompanied Marilyn to Jennifer’s hospital room whereupon they were met by Dr. Desangles.
Throughout the day on March 20, 1999, Marilyn communicated with Jennifer’s treating physician at the Bournigal Hospital as well as Dr. Desangles, who informed her that Jennifer’s condition had worsened. Marilyn also telephoned the office of Dr. Stryker and left a message, in which she stated that Jennifer’s condition had continued to deteriorate. Dr. Januzzi again returned Marilyn’s telephone call and advised that she evacuate Jennifer from the Dominican Republic. Upon learning of Dr. Januzzi’s instruction, George made arrangements to airlift Jennifer to Jack *279 son Memorial Hospital (“Jackson Memorial”) in Miami, Florida. Later that evening, Jennifer was life-flighted to Jackson Memorial. Subsequently, Jennifer was transferred to Miami Children’s Hospital (“Miami Children’s”) for treatment. After a brief period of recovery, on April 20, 1999, Jennifer died of acute diabetic ketoacidosis.[3]
The Gianocostases filed this action on June 21, 2000, alleging negligence (Count I) and wrongful death (Count II) against Riu, Riusa II, S.A., Delta Holidays, LTD., Visantilla, A.I.E., and Macao Caribe Beach, S.A. The complaint further alleges negligence (Count III), negligent misrepresentation (Count IV), and wrongful death (Count V) against GWV.

DISCUSSION

I. Forum Non Conveniens

Pursuant to its renewed motion to dismiss for forum non conveniens, GWV asks this court to dismiss the Gianocostases’ negligent misrepresentation claim against GWV in favor of the Dominican Republic as a forum. GWV contends that Justice Hinkle erred in her January 27, 2005 Memorandum of Decision denying GWV s original motion to dismiss for forum non conveniens as to the negligent misrepresentation claim insofar as Justice Hinkle concluded that the private interest factors favored neither Massachusetts nor the Dominican Republic as a forum. In support of its contention, GWV points out that the negligent representation claim against GWV is predicated entirely upon alleged misrepresentations made to the Gianocostases by Harris concerning the quality of medical care provided Jennifer in the Dominican Republic and her response to that treatment. Therefore, GWV asserts that proof of the Gianocostases’ misrepresentation claim, and GWV’s defense thereto, requires evidence which is located primarily in the Dominican Republic. In other words, GWV argues that the Gianocostases cannot prove their claim of negligent misrepresentation, and GWV cannot adequately defend against it, unless the claim is litigated in the Dominican Republic.
While this Court recognizes that evidence of the Gianocostases’ claim of negligent misrepresentation converges in the Dominican Republic, this Court is not inclined to depart from the January 27, 2005 decision of Justice Hinkle. This disinclination is bolstered by the fact that GWV unsuccessfully moved Justice Hinkle for reconsideration of her decision, and the Court of Appeals declined interlocutory review and reversal of that same decision.
Although labeled as a renewed motion to dismiss, GWV’s motion, in essence, asks this court to reconsider the January 27, 2005 decision of Justice Hinkle, in which she denied GWV’s motion to dismiss the Gianocostases’ negligent misrepresentation claim on Jorum non conveniens grounds. Therefore, this Court treats GWV’s renewed motion to dismiss as one for reconsideration. See Littles v. Comm’r of Correction, 444 Mass. 871, 873 (2005); Johnson v. Cohan, Civil No. 96-7352 (Middlesex Super.Ct. June 5, 2000) (Fabricant, J.). Indeed, GWV’s renewed motion to dismiss appears to be a renewed motion for reconsideration insofar as Justice Hinkle refused to reconsider the issue of forum non conveniens.
This Court has discretion to reconsider a decision on an interlocutory motion. See Riley v. Presnell, 402 Mass. 239, 242 (1991); King v. Globe Newspaper Co., 400 Mass. 705, 707 (1987). Although this Court possesses such authority, this power must be exercised with caution and only in light of compelling circumstances. Id. at 707-08. In the absence of such circumstances, a Justice has no duty to reconsider a prior decision and should hesitate to undo his or her own work. Id. “Still more should [a Justice] hesitate to undo the work of another judge.” Peterson v. Hopson, 306 Mass. 597, 603 (1940). Nevertheless, it is most important that this Court act in the interests of justice. Franchi v. Stella, 42 Mass.App.Ct. 251, 258 (1997).
In her Memorandum of Decision dated January 27, 2005, Justice Hinkle concluded in her forum non conveniens analysis, that, on balance, the private interest factors favored neither Massachusetts nor the Dominican Republic as a forum for the negligent misrepresentation claim because that claim arose from representations made by Harris to the Gianocostases in the Dominican Republic as well as statements GWV made to Jennifer in Massachusetts. Nevertheless, in light of the instructions the Court of Appeals imparted on remand, Justice Hinkle found that the public interest factors present in her forum non convenvens analysis indicated Massachusetts as the appropriate forum for the negligent misrepresentation claim.
GWV requests that this Court revisit Justice Hinkle’s forum non conveniens analysis because that aspect of the Gianocostases’ negligent misrepresentation claim which is based upon the representations of GWV to Jennifer in Massachusetts no longer remains in this case. This Court does not believe, however, that this circumstance warrants a different outcome from that which Justice Hinkle rendered in her January 27, 2005 decision.
In light of the presumption in favor of the Gianocostases’ choice of forum, the fact that the private interest factors may now point to the Dominican Republic as a forum for the negligent representation claim is not a compelling reason for this court to “undo” Justice Hinkle’s January 27, 2005 decision when Justice Hinkle determined in that ruling that the public interest factors present here weighed strongly in favor of a Massachusetts forum. See Kearsage Metallurgical Corp. v. Peerless Ins. Co, 38 Mass. 162, 169 (1981).
Therefore, this Court is not compelled to accept GWV’s contention that this subsequent change in circumstance justifies its renewed motion to dismiss *280 for forum non conveniens. This is particularly so given that both Justice Hinkle and the Court of Appeals passed on the opportunity to reexamine this veiy issue. Accordingly, GWV’s renewed motion to dismiss the negligent misrepresentation claim in Count IV on grounds of forum non conveniens is DENIED.

II. Standard for Summary Judgment

Summaiy judgment shall be granted only where there are no issues of material facts in dispute and where the summary judgment record entities the moving party to judgment as a matter of law. Cassesso v. Comrn’r of Corr., 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P 56(c). In deciding a motion for summary judgment, the court views the facts in a light most favorable to the non-moving party. G.S. Enters, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving party bears the burden of affirmatively demonstrating the absence of a triable factual issue and of showing that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Once the moving party demonstrates the absence of a triable issue, the non-moving party must set forth specific facts establishing the existence of a genuine dispute as to a material fact. Comellas v. Viveiros, 410 Mass. 314, 317 (1991). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and requires summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Even if the facts ofthecase are disputed, “summary judgment is still available if the party with the burden of proof at trial. . . fails to present in the summary.judgment record, taking everything it says as true and drawing all reasonable inferences in its favor, sufficient facts to warrant a finding in its favor.” NG Bros. Conste, Inc. v. Cranney, 436 Mass. 638, 644 (2002).
A. Negligent Misrepresentation Claim
The Gianoscostases seek damages against GWV for the death of Jennifer under a theory of negligent misrepresentation as set forth in Restatement (Second) of Torts §311. Section 311 of the Restatement defines negligent misrepresentation as follows:
(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
(a) to the other, or
(b) to such third persons as the actor should expect to be put in peril by the action taken.
(2) Such negligence may consist of failure to exercise reasonable care
(a) in ascertaining the accuracy of the information, or
(b) in the manner in which it is communicated
Therefore, a cause of action for negligent misrepresentation under §311 consists of the negligent provision of false information to another upon which the other reasonably relies to his or her physical harm, or that of a third person.
The Gianocostases argue that they relied on false representations made by Harris about Jennifer’s condition and the quality of medical care available to Jennifer in the Dominican Republic, as a result of which the Gianocostases delayed their efforts to evacuate Jennifer from the Dominican Republic. The Gianocostases claim that had they evacuated Jennifer sooner from the Dominican Republic, Jennifer would have received proper medical treatment thereby preventing the fatal deterioration of her health. GWV maintains, however, that Massachusetts does not recognize negligent misrepresentation under §311 as a basis for liability. Even if this court were willing to endorse a cause of action for negligent misrepresentation as set forth in §311, GWV further contends that it is entitled to summary judgment on the Gianocostases’ claim.
As an initial matter, this court looks to whether this Commonwealth has recognized a cause of action for negligent misrepresentation pursuant to §311. The Gianocostases assert the viability of such a claim in Massachusetts because the Court of Appeals referenced §311 when it dealt with the issue of forum non conveniens in this very case.
Although the Court of Appeals in its decision did restate the elements of negligent misrepresentation as set out in §311, it did so in the context of its analysis of whether the Dominican Republic represented an adequate forum for the Gianocostases’ claims against GWV. The Court of Appeals, however, did not in the process explicitly adopt §311 as a basis for recoveiy in Massachusetts. Nor did the Court of Appeals even suggest that §311 constituted a cause of action applicable in this case. Instead, the Court of Appeals simply laid out the elements of a claim of negligent misrepresentation under §311 to attempt to ascertain whether the Dominican Republic would permit litigation of such a claim in light of the Dominican Republic’s concept of negligent conduct.
If the Court of Appeals had wished to adopt the standard set forth in §311, it would have done so in much the same manner as the Supreme Judicial Court espoused the approach of Restatement (Second) of Torts §552, which, like §311, imposes liability for negligently giving false information. See Nycal v. KMPG Peat Marwick, LLP., 426 Mass. 491, 493-98 (1998). In Nycal, the Supreme Judicial Court affirmed the ruling of the trial judge wherein the trial judge used the test for negligent misrepresentation set out in §552. In so doing, the Supreme Judicial Court explicitly embraced §552 as the proper standard by which to evaluate a claim of negligent misrepresentation in the context of that case. Id. at 496-97.
*281 Here, although presented with the opportunity, the Court of Appeals made no such finding as to the applicability or appropriateness of §311. Therefore, absent clear direction from the higher courts of this Commonwealth, this court is unwilling to recognize a cause of action under §311 in this case. Nevertheless, even if this court were to apply §311 in this case, this court finds liability under §311 unavailable insofar as the statements made by Harris to the Gianocostases were her opinion, and the Gianocostases’ reliance on such statements was unreasonable.
- Section 311 establishes liability for physical harm, caused by the negligent communication of false information upon which another relies. The element of providing false information appears analogous to that which is necessary to demonstrate a common-law claim of misrepresentation based on a false statement. See Powell v. Rasmussen, 355 Mass. 117, 118 (1969). Indeed, those jurisdictions, including Massachusetts, that have recognized §552 as a cause of action have applied the same principles of falsity to both common-law misrepresentation and negligent misrepresentation claims. See Logan Equip. Corp. v. Simon Aerials, Inc., 736 F.Sup. 1188, 1199 (D.Mass. 1990); Birt v. Wells Fargo Home Mortgage, Inc., 75 P.3d 640, 657-58 (2003); Sain v. Cedar Rapids Cmty. School Dist., 626 N.W.2d 115, 127 (2001); McElroy v. Boise Cascade Corp., 632 S.W.2d 127, 130 (1982); Farragut Mortgage Co., Inc. v. Arthur Andersen, LLP, Civ. Action No. 95-6231 (Suffolk Super.Ct. August 5, 1999) (Burnes, J.) (10 Mass. L. Rptr. 285). Therefore, to establish a claim under §311, it seems to this court that the communication of false information is equivalent to the requirement of a claim of misrepresentation that a plaintiff show a false statement of material fact. McEneaney v. Chestnut Hill Realty Corp., 38 Mass.App.Ct. 573, 575 (1995).
A statement upon which liability for misrepresentation is based must be one of fact, not one of expectation, estimate, opinion, or judgment. Zimmerman v. Kent, 31 Mass.App.Ct. 72, 79 (1991). A representation is ordinarily considered one of opinion instead of fact if the statement merely expresses the maker’s “judgment as to quality, value, authenticity or other matters of judgment”; whereas a fact is something “susceptible of knowledge.” McEneaney, 38 Mass.App.Ct. at 575; Zimmerman, 31 Mass.App.Ct. at 79. Even a statement of opinion is actionable, however, “if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it.” McEneaney, 38 Mass.App.Ct. at 575. This is particularly true where the maker “possesses superior knowledge concerning the matter to which the misrepresentation relates.” Nota Constr. Corp. v. Keyes Assoc., Inc., 45 Mass.App.Ct. 15 (1998). Nevertheless, “(t]he determination whether a statement is one of fact or opinion is generally considered a question of law.” Cole v. Westinghouse Broad. Co., 386 Mass. 303, 309 (1982).
Here, to the extent that Harris represented that Jennifer would receive satisfactory medical treatment in the Dominican Republic, those statements were her opinion. Indeed, Harris merely expressed in general terms her judgment as to the quality of medical care in the Dominican Republic, and her personal belief as to Jennifer’s response to such treatment. Harris was not, however, in a position to obtain actual knowledge of the truth or falsity of her statements.
The degree of competence of the medical providers and the standard of medical care in the Dominican Republic are not matters in respect to which Harris could have actual knowledge. Nor are such matters ones over which Harris would be expected to have special or superior knowledge. See Gopen v. Am. Supply Co., 10 Mass.App.Ct. 342, 345 (1980). At the time of her statements, Harris was neither a doctor, nor familiar with the condition of diabetes. Therefore, Harris’ statements to the Gianocostases are not actionable statements for the purposes of §311.
Furthermore, the Gianocostases’ reliance on Harris’ expressions of opinion was unreasonable under the circumstances of this case. Like for a claim of misrepresentation, a claim of negligent misrepresentation under §311 requires reasonable reliance. See Collins v. HuchuLak, 57 Mass.App.Ct. 387, 391 (2003). The question of whether reliance is reasonable is generally one of fact, but this question may be resolved as a matter of law. Kuwaiti Danish Comp. Co. v. Digital Equip. Co., 438 Mass. 459, 467-70 (2003). Reliance has been deemed unreasonable in circumstances in which the plaintiff alleging misrepresentation has reason to know of facts which then make his or her reliance unjustifiable. See Restatement (Second) of Torts §541A cmt. a (1977); Cote v. Astra USA, Inc., Civil No. 96-2601 (Middlesex Super.Ct. Feb. 4, 1998) (Botsford, J.).
In this case, the summary judgment record reveals that the Gianocostases credited statements made by Harris about the condition of Jennifer and the adequacy of medical care in the Dominican Republic. The record further demonstrates that the Gianocostases had contacted Jennifer’s endocrinologist and had communicated with the doctors at the Clinic concerning Jennifer’s illness, who made assurances about Jennifer’s well-being. Those communications occurred the same day as Harris’ statements to the Gianocostases. Once in contact with medical professionals involved in the treatment of Jennifer, however, the Gianocostases could not have justifiably relied on Harris’ statements regarding Jennifer’s condition and medical care. Put another way, it would have been unreasonable for the Gianocostases to rely on the lay statements of Harris when the Gianocostases also received considered medical opinion regarding *282 Jennifer’s condition and medical care from the medical professionals tending her.
For the purposes of summary judgment, therefore, this court finds that the Gianocostases have failed to set forth specific facts from which a reasonable jury could find justifiable reliance on their part. Nor does the record indicate that Harris’ statements represented anything other than expressions of opinion. Since the Giancostosases have no reasonable expectation of proving essential elements of their negligent misrepresentation claim under §311, GWV is entitled to summary judgment on Count IV. See Kourouvacilis, 410 Mass, at 716.

B. Wrongful Death Claim

Pursuant to G.L.c. 229, §2, in relevant part, a wrongful death claim may be brought against a defendant who, by his or her negligence, causes the death of a person. Here, the Gianocostases allege that Jennifer’s death was the result of the representations made by Harris to the Gianocostases while an employee of GWV in the Dominican Republic. Therefore, the Gianocostases’ wrongful death claim is founded on its claim of negligent misrepresentation against GWV. Since the Gianocostases have failed to demonstrate a reasonable expectation of proving their claim of negligent misrepresentation against GMV, summary judgment as to the Gianocostases’ wrongful death claim based thereupon is appropriate.

ORDER

For the foregoing reasons, it is hereby ORDERED:
1. that defendant Interface Group-Massachusetts) Inc. d/b/a GWV International’s Renewed Motion To Dismiss on grounds of forum non conveniens be and hereby is DENIED.
2. that defendant Interface Group-Massachusetts, Inc. d/b/a GWV International’s Motion For Summary Judgment as to Counts IV and V be and hereby is ALLOWED.

 “Diabetic ketoacidosis (DKA) results from grossly deficient insulin availability, causing a transition from glucose to lipid oxidation and metabolism. In type I DM patients, DKA is commonly precipitated by a lapse in insulin treatment or by an acute infection, trauma, or infarction that makes usual insulin treatment inadequate.” Merck Manual, Sec. 2 Ch. 13, http: II wuiw. merck. com/ mrkshared/rrmvcmuai/section2/ch apter!3/13b.isp (5/24/2006).